# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Peter **MERGENTHALER**, Mac Truong**,**<br>   Plaintiffs,<br>   *- against -*<br>James W. **ZIMBLER**, Extreme Mobile<br>Coatings Corp, Ltd., Extreme Mobile Coatings<br>Worldwide, Corp., Structural Enhancement<br>Technologies Corporation, Eco-Petroleum<br>Solutions, Inc., Chase Bank, Harry **Zhabilov**,<br>**Billy Ray Miller,** Immunotech Laboratories, Inc.,<br>Charles **Cotropia, ENZOLYTICS, Inc.,**<br>Biogenysis, Inc., Virogentics, Inc.,<br>   Defendants, | **ACTION CIVIL No.** |

# PLAINTIFFS' COMPLAINT
### AGAINST DEFENDANTS HAVING ACTED IN CONCERT TO COMMIT FRAUDS AND GRAND LARCENIES IN VIOLATION OF PLAINTIFFS' CONSTITUTIONAL RIGHT TO PROPERTY.

Peter MERGENTHALER, and Mac Truong**,** Plaintiffs *pro se* herein, complaining of Defendants, allege as follows:

## JURISDICTION AND VENUE

1. This is a civil action by Plaintiffs *pro se* herein to recover from Defendants herein actual damages in excess of $450,000,000.00, being caused by them during a period of more than fifteen years in violation of 10 U.S.C. § 921 - Art. 121, to wit, grand larcenies, and wrongful appropriation of Plaintiff's properties by conspiracy, fraud, deception, willful material misrepresentations of fact and controlling legal authorities and by creating, keeping, and/or using false business records, to commit mail frauds, bank frauds, and/or

05

money laundering. Defendants did so through intensive daily interstate communications including U.S. Post Office mailing, telephonic conversations, duly recorded Internet messages, and signed agreements.  **As such, this U.S. District Court has subject-matter jurisdiction over this civil right action pursuant to 28 U.S.C. §1331,** which grants **federal** district courts original subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States" including but not limited to 10 U.S.C. § 921 - Art. 121 (**Larceny and wrongful appropriation**); and/or any other applicable provision of the U.S. Laws and Constitution, such as 18 U.S.C. § 1512(k) (**Conspiracy to Obstruct an Official Proceeding)**, or 18 U.S.C. §§ 1512(c)(2), 2 (**Obstruction of and/or Attempt to Obstruct an Official Proceeding,**) and/or 18 U.S.C. § 241 (**Conspiracy Against Rights.**)

2. **Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) and (c)** because almost all of the defendants are residing and/or doing business in the State of New York. Additionally, most of the events, circumstances, and/or actions such as creating and/or keeping false business records, or conspiracy occurred all over the world and hence also in New York. Finally, upon information and belief, none of the Defendants would object to the venue of this Court, which is not inconvenient for them to attend, viewing that Plaintiffs, being *pro se,* **request that we may not have to make oral arguments in open court against Defendants, most of whom are or represented by experienced licensed lawyers.**  All court filing or appearances on both sides will be done electronically and by submission of papers only.

# THE PARTIES

3. Plaintiff *pro se* Peter Mergenthaler is an individual residing recently in the State of Massachusetts. My current address is 494 Boston Post Road, Wayland, MA  01778. I was and still am the sole proprietary owner and controller of **Falcon Media Services, Ltd., a U.S. Public corporation,** since 2004. My company has the approval from the SEC to issue and trade its shares on the OTC.

4.  Plaintiff *pro se* Mac Truong is a 79-year-old U.S. citizen, residing in the State of New Jersey. My current address is 875 Bergen Avenue, Jersey City, NJ 07306.  I practiced

06

law extensively for more than 25 years as a lawyer in the State of New York in various State and federal courts at all levels, often up to the USCA2, USCA3, and SCOTUS. In 1993-1994 I was recommended by a dozen of U.S. Senators, including Patrick Daniel Moynihan, Frank Lautenberg, and Joe Biden, Jr., to then-President Bill Clinton to be appointed a SCOTUS associate justice. Presently, I am retired and no longer a licensed attorney at law.

5.  Defendant **James W. ZIMBLER** is an individual presently residing at 110 Smithtown Blvd., Suite 3, Nesconset, NY 11767.

6.  Upon information and belief, **Extreme Mobile Coatings Corp, Ltd.,** is a former corporation owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. Its address is 110 Smithtown Blvd, Suite 3, Nesconset, NY 11767.

7.  Upon information and belief, **Extreme Mobile Coatings Worldwide, Corp.,** is a former shell corporation owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. This corporation is a successor-in-interest to **Extreme Mobile Coatings Corp, Ltd.,** which was owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. Its address is 110 Smithtown Blvd, Suite 3, Nesconset, NY 11767.

8.  Upon information and belief, **Structural Enhancement Technologies Corporation** is a former shell corporation owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. This corporation is a successor-in-interest to **Extreme Mobile Coatings Worldwide, Corp.,** which was owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. Its address is 110 Smithtown Blvd, Suite 3, Nesconset, NY 11767.

9.  Upon information and belief, **Eco-Petroleum Solutions, Inc.,** is a former shell corporation owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. This corporation is a successor-in-interest to **Structural Enhancement Technologies Corporation,** which was owned and organized by Defendant James W. Zimbler, under the laws of the State of New York. Its address is 110 Smithtown Blvd, Suite 3, Nesconset, NY 11767.

07

10.   Upon information and belief, Defendant **Harry Zhabilov,** is an individual who operates his business in California, New York, Texas, and the rest of the world. His main street address is 2000 North Sentra Express Way, Plano, Texas 75074.

11.   Upon information and belief, Billy Ray Miller is a notorious financial consultant. He is also known as William Raymond Miller II, Billy V. Ray, Jr., William Raymond Miller, William Ray Miller II, and Ray Miller, or probably some other names only a few people would know of. Billy Ray is a convicted security felon and banned for life by a federal court from doing anything in the security industry or as an officer in a U.S. Public Corporation, such as Enzolytics. However, among others, his clients include Defendants **Harry Zhabilov** and **Charles Cotropia herein. His business address is in the care of Enzolytics, Inc.,** 1101 Raintree Circle, Suite 130, Allen, Texas 75013.

12.   Upon information and belief, **Defendant Immunotech Laboratories, Inc.,** was a corporation organized and existing under the laws of the State of California. It was owned and organized by Defendant **Harry Zhabilov.** Its address is 2000 North Sentra Express Way, Plano, Texas 75074. **Zhabilov merged Eco-Petroleum Solutions, Inc., he had acquired from James Zimbler, with Immunotech Laboratories, Inc.**

13.   **Immunotech Laboratories, Inc.** filed for registration with the SEC. The SEC rejected the request for registration on the ground that it was the same as the previous request, which had been rejected for containing unsubstantiated claims regarding products to be marketed.

14.   Upon information and belief, Defendant **Charles Cotropia** is the CEO and Chairman of **Enzolytics, Inc.** His business address is 1101 Raintree Circle, Suite 130, Allen, Texas 75013.

15.   Upon information and belief, **Enzolytics, Inc., ("ENZC")** is a corporation organized and existing under the laws of the State of Delaware. Its principal place of business is at 1101 Raintree Circle, Suite 130, Allen, Texas 75013, and/or 2000 North Sentra Express Way, Plano, Texas 75074. **This entity is the successor-in-interest to Eco-Petroleum Solutions, Inc., a former New York corporation.** Its CEO and Chairman is Defendant Charles Cotropia.

08

**16.**   Upon information and belief, **Biogenysis, Inc.,** is a subsidiary company of Enzolytics, Inc.,  Its principal place of business is at 1101 Raintree Circle, Suite 130, Allen, Texas 75013. Its CEO and Chairman is Defendant Charles Crotopia.

**17.**   Upon information and belief, **Virogentics, Inc.,** is a subsidiary company of Enzolytics, Inc.   Its principal place of business is at 1101 Raintree Circle, Suite 130, Allen, Texas 75013. Its CEO and Chairman is Defendant Charles Crotopia.

**18.**   **Defendant Chase Bank** is a large banking entity of the U.S.A. Its business address is **CHASE BANK,** 1000 Rocky Run Pkwy, Wilmington, DE 19803.

## SUMMARY STATEMENTS OF FACT
## GIVING RISE TO CAUSES OF ACTION

1. Starting on or about November 25, 2004, Plaintiff *pro se* Peter Mergenthaler is the sole true and registered lawful controlling owner of every share of Falcon Media Services, Ltd., a U.S. Public **"Falcon shares"** hereafter.  Plaintiff Mac Truong's legitimate interest in Falcon shares is recognized and acknowledged by Plaintiff Peter Mergenthaler in a written confidential agreement between them.

2. From 2008 to the present, Defendant James Zimbler acted in concert with all other Defendants, to wit: Extreme Mobile Coatings Corp, Ltd., Extreme Mobile Coatings Worldwide Corp, Structural Enhancement Technologies Corporation, Eco-Petroleum Solutions, Inc., Immunotech Laboratories, Inc., Chase Bank, Harry Zhabilov, Billy Ray Miller, Charles Cotropia, ENZOLYTICS, Inc., to unlawfully convert all Plaintiff Mergenthaler's Falcon shares, and fraudulently register them under the name of ENZOLYTICS, Inc., which shares have now been fraudulently transferred to several European business entities, including but not limited to its two operating subsidiaries Biogenysis, Inc. ("BGEN") and Virogentics, Inc. ("VIRO").

3. Upon information and belief, the foregoing Falcon shares are presently ready to be sold to good-faith investors-shareholders in Europe for the total amount of approximately $450,000,000.00, which, upon information and belief will not be paid, as a matter of law, to Plaintiff Peter Mergenthaler, the original owner of thereof. Upon information and belief,

09

they may not even be deposited in any U.S. bank account, or any account known to the IRS.

**4. The main purpose of this civil action is the recovery of the full value of Plaintiff's Falcon shares, which Plaintiff Peter Mergenthaler had contracted in 2008 to sell to Defendant James Zimbler, who had failed to pay approximately 90% of the contracted consideration to Plaintiff and as such had never lawfully acquired the legal title to any of the Falcon Shares, which are presently known and marketed under the latest names of Enzolytics, Inc.**

5. Despite the undisputed and SEC-registered fact that he had never received title to Falcon shares, Defendant Zimbler has acted in concert with all other Defendants herein to illegally change the name of Plaintiff's Falcon shares to many different names then finally that of Enzolytics, Inc., without Plaintiff's knowledge or consent.

6. On or about November 25, 2004, T&T Homes Limited, a U.K. corporate entity, changed its name to Falcon Media Services, Ltd., a U.S. Public corporation, which was totally owned and controlled by Plaintiff Peter Mergenthaler herein. **The ownership and power to control Falcon Media Services, Ltd., have been and shall continue to be referred to hereafter as the "Falcon shares."**

7. In 2008, Plaintiff Mergenthaler and Defendant Zimbler had an agreement by which Defendant Zimbler would acquire all Falcon shares from Plaintiff Mergenthaler for a lump sum of $650,000.00. However, after paying only a downpayment of about 10% of that contract amount, Defendant Zimbler, who was not yet legal owner and/or controller of Falcon Media Services, Ltd., (Falcon shares,) filed an application with the SEC to merge Falcon Media Services, Ltd., with Extreme Mobile Coatings Corp, Ltd., a legal entity under his ownership and control. As hereinabove mentioned, since besides a 10% downpayment, Defendant Zimbler had failed to pay the contract price of $650,000.00 to Plaintiff Mergenthaler, he has never become the lawful owner of the Falcon shares. **The title has never been passed on to Zimbler or any of the legal entities that succeeded Extreme Mobile Coatings Corp, Ltd., which was and continues to be as a matter of law and fact property of Plaintiff Mergenthaler herein.**

**10**

8. Upon information and belief, on or about March 2, 2009, Defendant Zimbler changed the name of Extreme Mobile Coatings Corp., Ltd., to Extreme Mobile Coatings Worldwide, Corp., which was totally owned and controlled by him.

9. On or about May 19, 2010, Extreme Mobile Coatings Worldwide, Corp., changed its name to Structural Enhancement Technologies Corp., which was totally owned and controlled by the same Defendant Zimbler.

10. On or about November 16, 2012, Structural Enhancement Technologies Corp. changed its name to Eco-Petroleum Solutions, Inc., which was totally owned and controlled by the same Defendant Zimbler.

11. Upon information and belief, in 2016, Defendant Harry **Zhabilov** and his Immunotech Laboratories, Inc., acquired Eco-Petroleum Solutions, Inc., from Defendant Zimbler. In the process that follows, Defendant Zhabilov illegally issued in the name of Eco-Petroleum Solutions, Inc., literally **billions of shares** to his family and friends for services allegedly rendered.

12. On or about January 30, 2018, Immunotech Laboratories, Inc., was acquired by Defendant Enzolytics, Inc., which is owned and controlled by Defendant Harry Zhabilow.

**13.** According to its press release of July 11, 2023, COLLEGE STATION, TX/ACCESSWIRE/Enzolytics, Inc. (OTC PINK:ENZC) (https://enzolytics.com/) **Enzolytics, Inc. ("ENZC" or the "Company") filed a Supplemental Information report** to provide additional details regarding the recently entered non-binding letter of intent with Sagaliam Acquisition Corp. ("NASDAQ: SAGA") ("SAGA") (together the "Parties") **to sell Enzolytics, Inc.'s two operating subsidiaries Biogenysis, Inc. ("BGEN") and Virogentics, Inc. ("VIRO") in a transaction valued at $450 million.**

14. Upon information and belief, the SEC and all the Defendants herein are aware and keep records of the succession and transfer of Plaintiffs' ownership, control, and interest in Falcon shares. As a consequence, all Defendants' acting in concert to convert Plaintiffs' full interest in Falcon shares is willful, intentional, fraudulent, and in sanctionable bad faith.

**15. Plaintiffs reserve the right to amend the foregoing complaint to sue Defendants for more injuries and/or damages when newly discovered facts have been established to warrant such amendments.**

**11**

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST ALL DEFENDANTS' ILLEGAL
## VIOLATION OF PLAINTIFFS' CONSTITUTIONAL
## RIGHTS TO PROPERTY AND DUE PROCESS

16.   Plaintiffs repeat all the allegations already made hereinabove with the same force and effect as if fully set forth at length herein.

17.   The facts indicate that during a period of about fifteen years from 2008 to the present time, Defendants herein have actually injured and damaged Plaintiffs herein in the minimum amount of Four Hundred Fifty Million Dollars ($450,000,000.00,) in violation of 10 U.S.C. § 921 - Art. 121 (**Larceny and wrongful appropriation**); and/or 18 U.S.C. § 1512(k) (**Conspiracy to Obstruct an Official Proceeding**), and/or 18 U.S.C. §§ 1512(c)(2),2 (**Obstruction of and/or Attempt to Obstruct an Official Proceeding**,) and/or 18 U.S.C. § 241 (**Conspiracy Against Rights**.)

18.   In simple language, undisputedly Defendants have acted in concert to commit grand larcenies, and wrongful appropriation of Plaintiffs' properties by conspiracy, fraud, deception, willful material misrepresentations of fact, and/or controlling legal authorities, by creating, keeping, and/or using false business records, to commit mail frauds, bank frauds, and/or money laundering. Defendants did so through intensive daily interstate communications including U.S. Post Office mailing, telephonic conversations, duly recorded Internet messages, and signed agreements.

19.   As a consequence, Plaintiffs are entitled to an order by this Court directing that Defendant Enzolytics, Inc., and each and all other Defendants herein, individually, jointly, and severally, within a period of 14 days following the issuance of the Order-Judgment, turn over to Plaintiffs Peter Mergenthaler and Mac Truong the minimum amount of the converted assets of approximately $450,000,000.00 (Four Hundred Fifty Million Dollars).

**12**

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST ALL DEFENDANTS' ILLEGAL
## VIOLATION OF PLAINTIFFS' CONSTITUTIONAL
## RIGHTS TO PROPERTY AND DUE PROCESS

20.   Plaintiffs repeat all the allegations already made hereinabove with the same force and effect as if fully set forth at length herein.

21.   The facts indicate that during a period of about fifteen years from 2008 to the present time, Defendants herein have actually injured and damaged Plaintiffs herein in the minimum amount of Four Hundred Fifty Million Dollars ($450,000,000.00,) in violation of 10 U.S.C. § 921 - Art. 121 (**Larceny and wrongful appropriation**); and/or 18 U.S.C. § 1512(k) (**Conspiracy to Obstruct an Official Proceeding**), and/or 18 U.S.C. §§ 1512(c)(2),2 (**Obstruction of and/or Attempt to Obstruct an Official Proceeding,**) and/or 18 U.S.C. § 241 (**Conspiracy Against Rights**.)

22.   In simple language, undisputedly Defendants have acted in concert to commit grand larcenies, and wrongful appropriation of Plaintiffs' properties by conspiracy, fraud, deception, willful material misrepresentations of fact, and/or controlling legal authorities, by creating, keeping, and/or using false business records, to commit mail frauds, bank frauds, and/or money laundering. Defendants did so through intensive daily interstate communications including U.S. Post Office mailing, telephonic conversations, duly recorded Internet messages, and signed agreements.

23.   As a consequence, pursuant to the Court's legal duty of reporting to the Department of Justice any crime, of which the Court has judicial notice during a civil proceeding under its jurisdiction, Plaintiffs are entitled to an order of this Court referring all Defendants herein to the U.S. Department of Justice and/or any appropriate legal authorities to investigate their conspiracy and criminal misconduct, indict, and prosecute them as a matter of law and in the interest of justice.

**13**

WHEREFORE Plaintiff respectfully moves the Court for a Judgment:

1. Granting Plaintiffs herein a monetary judgment in the sum of **Four Hundred Fifty Million Dollars ($450,000,000.00) for Plaintiffs' First and Second Causes of action, and against Defendant Enzolytics, Inc., and each and all other Defendants herein, individually, jointly, and severally, to be paid to Plaintiffs within a period of 14 days following the issuance of the Order-Judgment;** and

2. Granting such further and other ancillary relief as the Court may deem fair just and appropriate in the premises and circumstances.

Dated:  July 30, 2023

Peter Mergenthaler, Plaintiff *pro se*

Mac Truong, Plaintiff *pro se*

**14**

# Disclosure Statement Pursuant to the Pink Basic Disclosure Guidelines

# ENZOLYTICS, INC.

2000 North Central Expressway, Plano, TX 75074

(972)-292-9414

www.enzolytics.com

harry@enzolytics.com

SIC Code 541711

**Annual Report**
**For the Period Ending:** December 31, 2020
(the "Reporting Period")

As of December 31, 2020, the number of shares outstanding of our Common Stock was: 2,797,935,953

As of September 30, 2020, the number of shares outstanding of our Common Stock was: 2,438,670,097

As of December 31, 2019, the number of shares outstanding of our Common Stock was: 1,066,020,359

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐        No: ☒

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐        No: ☒

Indicate by check mark whether a Change in Control[1] of the company has occurred over this reporting period:

Yes: ☐        No: ☒

---

[1] "Change in Control" shall mean any events resulting in:

(i) Any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becoming the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities;

(ii) The consummation of the sale or disposition by the Company of all or substantially all of the Company's assets;

(iii) A change in the composition of the Board occurring within a two (2)-year period, as a result of which fewer than a majority of the directors are directors immediately prior to such change; or

(iv) The consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation.

### 1) Name of the Issuer and its predecessors (if any)

In answering this item, please also provide any names used by predecessor entities and the dates of the name changes.

The exact name of the issuer is: **Enzolytics, Inc.**

| Formerly | Date changed |
|---|---|
| Immunotech Laboratories, Inc | September 11, 2017 |
| Eco-Petroleum Solutions, Inc. | November 16, 2012 |
| Structural Enhancement Technologies Corp. | May 10, 2010 |
| Extreme Mobile Coatings Worldwide Corp. | March 2, 2009 |
| Extreme Mobile Coatings Corp., Ltd. | October 10, 2008 |
| Falcon Media Services, Ltd. | November 24, 2004 |
| T&T Homes Limited | July 28, 2004 |

Date and state (or jurisdiction) of incorporation (also describe any changes to incorporation since inception, if applicable) Please also include the issuer's current standing in its state of incorporation (e.g. active, default, inactive):

| State / Jurisdiction of Incorporation: | United Kingdom |
|---|---|
| | Domiciled to Delaware February 23, 2009 |
| | Re-Domiciled to Wyoming May 21, 2020 |
| | Re-Domiciled to Delaware November 4, 2020 |
| | (currently Delaware - active) |

| Date Incorporated: | July 28, 2004 |
|---|---|

Describe any trading suspension orders issued by the SEC concerning the issuer or its predecessors since inception:
None

List any stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months:
None

The address(es) of the issuer's principal executive office:

Enzolytics, Inc
2000 North Central Expressway
Plano, Texas 75074

The address(es) of the issuer's principal place of business:
*Check box if principal executive office and principal place of business are the same address:* ☐

Enzolytics, Inc.
Texas A&M University
Institute for Preclinical Studies
College Station, TX 77843-4478

Has the issuer or any of its predecessors been in bankruptcy, receivership, or any similar proceeding in the past five years?
Yes: ☐    No: ☒

If this issuer or any of its predecessors have been the subject of such proceedings, please provide additional details in the space below: **N/A**

### 2) Security Information

| Trading symbol: | ENZC PK |
|---|---|
| Exact title and class of securities outstanding: | Common |
| CUSIP: | 294112107 |
| Par or stated value: | .0001 |

| Total shares authorized: | 3,000,000,000 | as of date: 12/31/2020 |
|---|---|---|
| Total shares outstanding: | 2,797,935,953 | as of date: 12/31/2020 |
| Number of shares in the Public Float[2]: | 1,670,830,512 | as of date: 12/31/2020 |
| Total number of shareholders of record: | 197 | as of date: 12/31/2020 |

*All additional class(es) of publicly traded securities (if any):*

| Trading symbol: | N/A | |
|---|---|---|
| Exact title and class of securities outstanding: | Series A Preferred | |
| CUSIP: | N/A | |
| Par or stated value: | .0001 | |
| Total shares authorized: | 60,000,000 | as of date: 12/31/2020 |
| Total shares outstanding: | 60,000,000 | as of date: 12/31/2020 |
| Number of shares in the Public Float[3]: | 0 | as of date: 12/31/2020 |
| Total number of shareholders of record: | 3 | as of date: 12/31/2020 |

| Trading symbol: | N/A | |
|---|---|---|
| Exact title and class of securities outstanding: | Series B Preferred | |
| CUSIP: | N/A | |
| Par or stated value: | .0001 | |
| Total shares authorized: | 465,000,000 | as of date: 12/31/2020 |
| Total shares outstanding: | 445,180,000 | as of date: 12/31/2020 |
| Number of shares in the Public Float[4]: | 0 | as of date: 12/31/2020 |
| Total number of shareholders of record: | 5 | as of date: 12/31/2020 |

| Trading symbol: | N/A | |
|---|---|---|
| Exact title and class of securities outstanding: | Series C Preferred | |
| CUSIP: | N/A | |
| Par or stated value: | .0001 | |
| Total shares authorized: | 10,000,000 | as of date: 12/31/2020 |
| Total shares outstanding: | 941,078 | as of date: 12/31/2020 |
| Number of shares in the Public Float[5]: | 0 | as of date: 12/31/2020 |
| Total number of shareholders of record: | 2 | as of date: 12/31/2020 |

Transfer Agent

Name:   Nevada Agency and Transfer Company
Phone:  (775) 322-0626
Email:  Tiffany@natco.com

Is the Transfer Agent registered under the Exchange Act?[6] Yes: ☒        No: ☐

---

[2] "Public Float" shall mean the total number of unrestricted shares not held directly or indirectly by an officer, director, any person who is the beneficial owner of more than 10 percent of the total shares outstanding (a "control person"), or any affiliates thereof, or any immediate family members of officers, directors and control persons.

[3] "Public Float" shall mean the total number of unrestricted shares not held directly or indirectly by an officer, director, any person who is the beneficial owner of more than 10 percent of the total shares outstanding (a "control person"), or any affiliates thereof, or any immediate family members of officers, directors and control persons.

[4] "Public Float" shall mean the total number of unrestricted shares not held directly or indirectly by an officer, director, any person who is the beneficial owner of more than 10 percent of the total shares outstanding (a "control person"), or any affiliates thereof, or any immediate family members of officers, directors and control persons.

[5] "Public Float" shall mean the total number of unrestricted shares not held directly or indirectly by an officer, director, any person who is the beneficial owner of more than 10 percent of the total shares outstanding (a "control person"), or any affiliates thereof, or any immediate family members of officers, directors and control persons.

[6] To be included in the Pink Current Information tier, the transfer agent must be registered under the Exchange Act.

### 3) Issuance History

The goal of this section is to provide disclosure with respect to each event that resulted in any direct changes to the total shares outstanding of any class of the issuer's securities **in the past two completed fiscal years and any subsequent interim period**.

Disclosure under this item shall include, in chronological order, all offerings and issuances of securities, including debt convertible into equity securities, whether private or public, and all shares, or any other securities or options to acquire such securities, issued for services. Using the tabular format below, please describe these events.

### A. Changes to the Number of Outstanding Shares

Check this box to indicate there were no changes to the number of outstanding shares within the past two completed fiscal years and any subsequent periods: ☐

| Shares Outstanding as of Second Most Recent Fiscal Year End: Opening Balance Date 12/31/2018 Common: 817,748,470 Preferred A: 60,000,000 Preferred B: 20,000,000 Preferred C: 0 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Transaction | Transaction type (e.g. new Issuance, cancellation, shares returned to treasury) | Number of Shares Issued (or cancelled) | Class of Securities | Value of shares issued ($/per share) at Issuance | Were the shares issued at a discount to market price at the time of Issuance? (Yes/No) | Individual/ Entity Shares were Issued to (entities must have individual with voting / investment control disclosed). | Reason for share Issuance (e.g. for cash or debt conversion) -OR- Nature of Services Provided | Restricted or Unrestricted as of this filing. | Exemption or Registration Type. |
| January 24, 2019 | Issuance | 66,376,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Restricted | Registration |
| February 7, 2019 | Issuance | 72,660,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| February 12, 2019 | Issuance | 13,248,889 | Common | .00038 | yes | William Tynan | Debt Conversion | Unrestricted | Registration |
| December 6, 2019 | Issuance | 38,762,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| December 18, 2019 | Issuance | 57,225,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| January 22, 2020 | Issuance | 51,392,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| January 29, 2020 | Issuance | 47,000,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| January 29, 2020 | Issuance | 63,972,603 | Common | .0001 | yes | Sky Direct LLC Darlene Pergola | Debt Conversion | Unrestricted | Registration |

| March 12, 2020 | Issuance | 114,444,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
|---|---|---|---|---|---|---|---|---|---|
| April 13, 2020 | Issuance | 105,137,700 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | 3(a)(10) Conversion | Unrestricted | Registration |
| June 4, ,2020 | Issuance | 68,534,900 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| June 18 ,2020 | Issuance | 31,308,550 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| June 25 ,2020 | Issuance | 48,616,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| July 9, 2020 | Issuance | 100,403,400 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| July 14, 2020 | Issuance | 57,882,900 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| July 16, 2020 | Issuance | 100,567,400 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| August 20, 2020 | Issuance | 138,571,000 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| August 26, 2020 | Issuance | 10,000,000 | Common | .0001 | yes | Fred Allen Cole | Cash | Restricted | Registration |
| August 26, 2020 | Issuance | 15,000,000 | Common | .0001 | yes | Barrett Akers | Cash | Restricted | Registration |
| September 9, 2020 | Issuance | 4,000,000 | Common | .0001 | yes | Maurice Naarulan | Services | Restricted | Registration |
| September 18, 2020 | Issuance | 195,795,268 | Common | .0001 | yes | Sky Direct Darlene Pergola | Debt Conversion | Unrestricted | Registration |
| September 22, 2020 | Issuance | 203,149,447 | Common | .0001 | yes | Seacor Capital Lisa Ficarra | Debt Conversion | Unrestricted | Registration |
| September 22, 2020 | Issuance | 16,874,550 | Common | .0001 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| September 30, 2020 | Issuance | 50,000,000 | Series B | .0001 | no | Seacor Capital Lisa Ficarra | Services | Restricted | Registration |
| September 30, 2020 | Issuance | 100,000,000 | Series B | .0001 | no | Harry Zhabilov | Services | Restricted | Registration |
| October 9, 2020 | Issuance | 39,265,856 | Common | .0018 | yes | Livingston Asset Management Henry Sargent | Debt Conversion | Unrestricted | Registration |
| October 14, 2020 | Issuance | 70,000,000 | Common | .0065 | yes | Camelot Nevada Trust Kelli Austin | Services | Restricted | Registration |
| October 14, 2020 | Issuance | 50,000,000 | Common | .0065 | yes | Harry Zhabilov | Services | Restricted | Registration |

| October 14, 2020 | Conversion | (20,000,000) | Series B | .0001 | no | Seacor Capital Lisa Ficarra | Series B Conversion | Restricted | Registration |
|---|---|---|---|---|---|---|---|---|---|
| October 14, 2020 | Conversion | 200,000,000 | Common | .0001 | no | Seacor Capital Lisa Ficarra | Series B Conversion | Restricted | Registration |
| December 7, 2020 | Issuance | 30,664,500 | Series B | .0001 | no | Gaurav Chandra | Acquisition | Restricted | Registration |
| December 7, 2020 | Issuance | 86,882,750 | Series B | .0001 | no | Joseph Cotropia | Acquisition | Restricted | Registration |
| December 7, 2020 | Issuance | 86,882,750 | Series B | .0001 | no | Charles Cotropia | Acquisition | Restricted | Registration |
| December 7, 2020 | Issuance | 90,750,000 | Series B | .0001 | no | Harry Zhabilov | Acquisition | Restricted | Registration |
| December 22, 2020 | Issuance | 398,171 | Series C | .005 | no | Sky Direct Darlene Pergola | Debt Exchange | Restricted | Registration |
| December 22, 2020 | Issuance | 542,907 | Series C | .005 | no | Seacor Capital Lisa Ficarra | Debt Exchange | Restricted | Registration |
| December 31, 2020 | Issuance | 18,900,000 | Series A | .0001 | no | Zhabilov Trust Dianna Zhabilov | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | (50,000,000) | Series A | .0001 | no | Zhabilov Trust Diana Zhabilov | Reallocation for Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | (4,000,000) | Series A | .0001 | no | Harry Zhabilov | Reallocation for Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 5,265,000 | Series A | .0001 | no | Gaurav Chandra | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 14,917,500 | Series A | .0001 | no | Joseph Cotropia | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 14,917,500 | Series A | .0001 | no | Charles Cotropia | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 231,000,000 | Common | .0001 | no | Zhabilov Trust Diana Zhabilov | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | (462,000,000) | Common | .0001 | no | Zhabilov Trust Diana Zhabilov | Reallocation for Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 34,650,000 | Common | .0001 | no | Gaurav Chandra | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 98,175,000 | Common | .0001 | no | Joseph Cotropia | Acquisition | Restricted | Registration |
| December 31, 2020 | Issuance | 98,175,000 | Common | .0001 | no | Charles Cotropia | Acquisition | Restricted | Registration |

Shares Outstanding on Date of This Report:

Date: 12/31/2020    Ending Balance

     Common: 2,797,935,953

     Preferred A: 60,000,000

     Preferred B: 445,180,000

     Preferred C:    941,078

**Example:** A company with a fiscal year end of December 31st, in addressing this Item for its quarter ended September 30, 2019, would include any events that resulted in changes to any class of its outstanding shares from the period beginning on January 1, 2017 through September 30, 2019 pursuant to the tabular format above.

Use the space below to provide any additional details, including footnotes to the table above: **None**

## B. Debt Securities, Including Promissory and Convertible Notes

Use the chart and additional space below to list and describe all outstanding promissory notes, convertible notes, convertible debentures, or any other debt instruments that may be converted into a class of the issuer's equity securities.

Check this box if there are no outstanding promissory, convertible notes or debt arrangements: ☐

| Date of Note Issuance | Outstanding Balance ($) | Principal Amount at Issuance ($) | Interest Accrued ($) | Maturity Date | Conversion Terms (e.g. pricing mechanism for determining conversion of instrument to shares) | Name of Noteholder (entities must have individual with voting / investment control disclosed). | Reason for Issuance (e.g. Loan, Services, etc.) |
|---|---|---|---|---|---|---|---|
| April 28, 2010 | $140,000 | $150,000 | $109,030 | October 28, 2010 | 25% discount to the average 30 day closing price – see note 2 | Cimarron Capital; Peter Aiello | Loan |
| April 13, 2012 | $15,000 | $15,000 | $12,625 | October 31, 2012 | See note 1 below. See note 2 | Bruce Colgin | Loan |
| September 21, 2012 | $59,800 | $283,500 | $ 0 | September 21, 2015 | Note is not convertible, non-interest bearing– see note 2 | Peter Mergenthaler | Settlement Agreement |
| September 25, 2013 | $50,000 | $50,000 | $33,750 | December 24, 2013 | 85 percent of the market price (meaning the average of the lowest two trading prices for the five-day trading period before the date of conversion) – see note 2 | JLA Realty Associates LLC – Steven J. Caspi | Loan |
| October 18,2013 | $100,000 | $100,000 | $66,667 | January 16, 2014 | 85 percent of the market price (meaning the average of the lowest two trading prices for the five-day trading period before the date of conversion) – see note 2 | JLA Realty Associates LLC – Steven J. Caspi | Loan |
| March 9, 2017 | $25,000 | $25,000 | $10,664 | March 9, 2018 | 50% discount to the lowest closing bid during the past 10 days – see note 2 | KONA Concepts Inc; Peter Aiello | Loan |
| May 26, 2017 | $5,000 | $5,000 | $2,000 | July 10, 2018 | 50% discount to the lowest closing bid during the past 10 days. – see note 2 | Cimarron Capital; Peter Aiello | Loan |
| July 10, 2017 | $10,000 | $10,000 | $3,000 | July 10, 2018 | 50% discount to the lowest closing bid price over the past 10 trading days– see note 2 | Al Hanson | Assumed with acquisition |
| April 13, 2018 | $12,500 | $12,500 | $3,625 | April 13, 2019 | 50% discount to the lowest closing bid price over the past 10 trading days– see note 2 | AT Media Corp Carl Caserta | Loan |

Use the space below to provide any additional details, including footnotes to the table above:

1. The note carries an interest rate of 10 percent per annum, and may be either repaid, at the election of the note holder in cash plus the issuance of shares of common stock of the Company in the amount of $30,000 in value, or by the conversion of the principal and interest due into a total of $45,000 in value of common stock of the Company.
2. As a result of the reorganization, in accordance with Section 251(g) of the DGCL, the remaining previous convertible and non-convertible debt of ENZC is debt of the Predecessor and convertible into shares of the non-public subsidiary or payable by the Predecessor rather than the Parent.
3. On November 16, 2020 the Company entered into debt exchange agreements with Seacor Capital, Inc., and Sky_Direct, LLC whereby the balance of their outstanding notes and accrued interest were exchanged for Preferred Series C shares of ENZC extinguishing the debt obligation.

4)      **Financial Statements**

A.  The following financial statements were prepared in accordance with:

☒ U.S. GAAP
☐ IFRS

B.  The financial statements for this reporting period were prepared by (name of individual)[7]:

| | |
|---|---|
| Name: | **Jona Barnes, E. A., Partner** |
| Title: | **Partner, CPA** |
| Relationship to Issuer: | **None** |

Provide the financial statements described below for the most recent fiscal year or quarter. For the initial disclosure statement (qualifying for Pink Current Information for the first time) please provide reports for the two previous fiscal years and any subsequent interim periods.

C.  Balance sheet;
D.  Statement of income;
E.  Statement of cash flows;
F.  Statement of Changes in Shareholders' Equity
G.  Financial notes; and
H.  Audit letter, if audited

You may either (i) attach/append the financial statements to this disclosure statement or (ii) file the financial statements through OTCIQ as a separate report using the appropriate report name for the applicable period end. ("Annual Report," "Quarterly Report" or "Interim Report").

If you choose to publish the financial statements in a separate report as described above, you must state in the accompanying disclosure statement that such financial statements are incorporated by reference. You may reference the document(s) containing the required financial statements by indicating the document name, period end date, and the date that it was posted to OTCIQ in the field below. Financial Statements must be compiled in one document.

**Financial Statements are Incorporated by reference.**

Financial statement information is considered current until the due date for the subsequent report (as set forth in the qualifications section above). To remain qualified for Current Information, a company must post its Annual Report within 90 days from its fiscal year-end date and Quarterly Reports within 45 days of each fiscal quarter-end date.

5)      **Issuer's Business, Products and Services**

The purpose of this section is to provide a clear description of the issuer's current operations. In answering this item, please include the following:

A.  Summarize the issuer's business operations (If the issuer does not have current operations, state "no operations")

Enzolytics, Inc. is a Delaware corporation in the development stage. The Corporation was initially incorporated, under the name of T and T Homes Limited on July 28, 2004, in the United Kingdom. On November 25, 2004, the name of the Corporation was amended to be Falcon Media Services, Ltd. On November 12, 2008, the Company changed its name to Extreme Mobile Coatings Corp., Ltd. On March 2, 2009, the Company changed its name to Extreme Mobile Coatings Worldwide Corp. On May 19, 2010, the Company changed its name to Structural Enhancement Technologies Corp. Lastly, on November 16, 2012, the Company amended its name to Eco-Petroleum Solutions, Inc. to indicate a change in its business plan to expand its operations by entering into the renewable energy sector to conduct the business of blending, bottling, and distributing private label motor oil, transmission fluid, and related products for the automotive aftermarket.

---

[7] The financial statements requested pursuant to this item must be prepared in accordance with US GAAP or IFRS by persons with sufficient financial skills.

On July 21, 2017 the Company submitted a Corporate Action requesting a name and symbol change, as a required by the merger agreement, to change the name of the Company from Eco-Petroleum Solutions, Inc. to Immunotech Laboratories, Inc. to indicate the Company's entrance into the Drug Development Industry for Immunotherapies. The Company has received comments and responded and expects the process to be completed shortly. The request was subsequently withdrawn, and the merger agreement terminated.

On October 25, 2017 the Company's subsidiary Immunotech Laboratories, Inc. submitted a request to for the retirement of the Immunotech Laboratories, Inc. symbol IMMB from the OTC Market. The request was subsequently denied, and a deficiency letter issued resulting in the termination of the merger agreement.

On January 15, 2018 the merger agreement with Immunotech Laboratories, Inc. was terminated except for Section 1.03(d)(i) which relates to the appointment of Harry Zhabilov as Chairman and CEO of ECPO which remains in effect.

On January 30, 2018 a new Corporate action was filed by the Company to change its name from Eco-Petroleum Solutions, Inc. to Enzolytics, Inc. to better represent the new business strategy. The Corporate action was approved on March 22nd and the ticker symbol was changed from ECPO to ENZC. The amendment to the Articles of Incorporation in the state of Delaware were filed on January 17, of 2018 changing the name to Enzolytics, Inc.

On March 26, 2018 an asset purchase agreement was entered with Immunotech Laboratories, Inc whereby the Exclusive License Agreement for the Patented Immunotherapy Treatment for the care of HIV/Aids and Hepatitis C patients, the Forty Nine Percent ownership in Immunotech Laboratories BG, all equipment and licensing of intellectual property associated with the Patented treatment in exchange for a secured note receivable, common stock of Enzolytics, Inc. issued to Immunotech Laboratories, Inc. and assumption of certain debt from Immunotech by Enzolytics, Inc.

On June 25, 2018, the Company entered into a settlement agreement and stipulation ("Settlement Agreement") with Livingston Asset Management LLC ("Livingston") in connection with the settlement of $563,000 of bona fide obligations the Company owed to certain of its creditors. The Settlement Agreement was subject to Federal court fairness hearing, and on August 21, 2018 a Federal court granted approval of the Settlement Agreement. If satisfied in full, pursuant to the Settlement Agreement the Company shall reduce the Company's debt obligations in exchange for the issuance of 563,000,000 shares of Company's common stock, in multiple tranches, pursuant to the terms of section 3(a)(10) of the Securities Act of 1933, as amended. At no time may Livingston beneficially own more than 9.99% of the Company's outstanding common stock. In connection with the transaction, the Company issued to Livingston a convertible promissory note in the principal amount of $100,000 bearing interest of 10% per year to cover legal fees and other expenses, The Note is convertible into shares of the Company's common stock at 50% of the lowest closing bid price for 10 trading days prior to the date of conversion. Under the terms of a separate engagement letter, in connection with the settlement agreement, the Company is to pay a registered placement agent ten percent (10%) of the dollar amount of creditor obligations extinguished pursuant to the settlement agreement. As of March 31, 2020, 447,859,000 shares have been converted.

On April 16, 2020, the Company announced its new physical address and telephone number, 2000 N. Sentra Express Way, Unit 104, Plano, Texas 75074, telephone number, (972) 292-9414.

On April 30, 2020, the Company filed Foreign Profit Corporation Article of Continuance pursuant to Wyoming Statute W.S. 17-16-1810 to redomicile the Company from Delaware to Wyoming and increasing the authorized common shares to three billion. On May 21, 2020, the Company was approved by the State of Wyoming.

On September 15, 2020, Enzolytics, Inc. and BioClonetics Immunotherapy, Inc., a biotech company located in Dallas, TX, announced the execution of a Letter of Intent to merge the two entities together with the intent to combine the two proprietary technologies to evaluate the beneficial and synergistic effect of combining therapeutics of the two entities to treat those infected with the HIV virus.

On October 22, 2020, the Company announced the appointment, by the Board of Directors of the Company, on October 20, 2020, of Charles Cotropia to the position of CEO of Enzolytics. Mr. Cotropia also serves as CEO of the Company's Merger target BioClonetics Immunotherapeutics, and Harry Zhabilov the former CEO of the Company has taken the position of CSO. Charles Cotropia was appointed to the Company's Board of Directors on October 1, 2020. Simultaneously, Harry Zhabilov was appointed to the BioClonetics Immunotherapeutics board.

On November 4, 2020 the Company filed to redomicile in the State of Delaware.

On November 16, 2020, the issuer (having been renamed, immediately prior to this Holding Company Reorganization, from "Enzolytics, Inc." to "ENZC SUB, Inc.") completed a corporate reorganization (the "Holding Company Reorganization") pursuant to which ENZC SUB, Inc., as previously constituted (the "Predecessor") became a direct, wholly-owned subsidiary of a newly formed Delaware corporation, Enzolytics, Inc. (the "Holding Company"), which became the successor issuer. In other words, the Holding Company is now the public entity. The Holding Company Reorganization was effected by a merger conducted pursuant to Section 251(g) of the Delaware General Corporation Law (the "DGCL"), which provides for the formation of a holding company without a vote of the stockholders of the constituent corporations.

In accordance with Section 251(g) of the DGCL, Enzolytics Merger Corp. ("Merger Sub"), another newly formed Delaware corporation and, prior to the Holding Company Reorganization, was an indirect, wholly owned subsidiary of the Predecessor, merged with and into the Predecessor, with the Predecessor surviving the merger as a direct, wholly owned subsidiary of the Holding Company (the "Merger"). The Merger was completed pursuant to the terms of an Agreement and Plan of Merger among the Predecessor, the Holding Company and Merger Sub, dated November 16, 2020 (the "Merger Agreement").

As of the effective time of the Merger and in connection with the Holding Company Reorganization, all outstanding shares of common stock and preferred stock of the Predecessor were automatically converted into identical shares of common stock or preferred stock, as applicable, of the Holding Company on a one-for-one basis, and the Predecessor's existing stockholders and other holders of equity instruments, became stockholders and holders of equity instruments, as applicable, of the Holding Company in the same amounts and percentages as they were in the Predecessor prior to the Holding Company Reorganization.

The executive officers and board of directors of the Holding Company are the same as those of the Predecessor in effect immediately prior to the Holding Company Reorganization.

For purposes of Rule 12g-3(a), the Holding Company is the successor issuer to the Predecessor, now as the sole shareholder of the Predecessor. Accordingly, upon consummation of the Merger, the Holding Company's common stock was deemed to be registered under Section 12(b) of the Securities Exchange Act of 1934, as amended, pursuant to Rule 12g-3(a) promulgated thereunder.

The Holding Company adopted a certificate of incorporation (the "Certificate") and bylaws (the "Bylaws") that are, in all material respects, identical to the certificate of incorporation and bylaws of the Predecessor immediately prior to the Holding Company Reorganization, with the possible exception of certain amendments that are permissible under Section 251(g)(4) of the DGCL. The Holding Company has the same authorized capital stock and the designations, rights, powers and preferences of such capital stock, and the qualifications, limitations and restrictions thereof are the same as that of the Predecessor's capital stock immediately prior to the Holding Company Reorganization.

The common stock of the Holding Company trades on OTC Markets under the symbol "ENZC" under which the common stock of the Predecessor was previously listed and traded. As a result of the Holding Company Reorganization, the common stock of the Predecessor will no longer be publicly trade.

On November 30, 2020, Enzolytics, Inc. (the "Company") entered into a Business Combination Agreement with Bioclonetics Immunotherapeutics, Inc., ("Bioclonetics") a Texas Corporation controlled by Charles S. Cotropia, the Company's current Chief Executive Officer.

As consideration for the Business Combination, and in exchange for 100% of the issued and outstanding stock of BioClonetics, the Company has agreed to issue a total of 204,430,000 newly issued shares of Series B Preferred Stock to Charles S. Cotropia, and others Bioclonetics Designees and 90,570,000 shares of newly issued Series B Preferred Stock to Harry Zhabilov, the Company's current Chief Financial Officer. These shares were issued on December 7, 2020.

In addition, on November 30, 2020, the Zhabilov Trust, the Company's Controlling Shareholder, entered into a Control Block Transfer Agreement, under which the Zhabilov Trust has agreed to transfer 35,100,000 shares of Series A Preferred Stock

and 231,000,000 shares of Common Stock (together the "Control Block") to Charles S. Cotropia and other Bioclonetics Designees. This reallocation of shares from Zhabilov Trust was completed on December 31, 2020.

Once such share issuances and transfers are completed, Charles S. Cotropia will be the Company's new Control Block holder and majority shareholder, in addition to his role as Chief Executive Officer of Enzolytics, Inc., resulting in a Change of Control.

In addition, on November 16, 2020 the Company entered into debt exchange agreements with Seacor Capital, Inc., and Sky_Direct, LLC whereby the balance of their outstanding notes and accrued interest were exchanged for Preferred Series C shares of ENZC extinguishing the debt obligation.

As a result of the reorganization, in accordance with Section 251(g) of the DGCL, the remaining convertible abd non-convertible debt of ENZC is now debt of the Predecessor and payable by or convertible into shares of the non-public subsidiary.

Pursuant to the terms of the Business Combination Agreement, on November 24, 2020, the Company formed two new Texas corporations as wholly-owned subsidiaries for the purpose of licensing certain patented technologies: Biogenysis, Inc. and Virogentics, Inc.

<u>Two Patent License Agreements</u>

On November 30, 2020, Biogenysis, Inc., a wholly-owned subsidiary of Enzolytics, Inc., entered into a Patent License Agreement with Bioclonetics in order to license the U.S. Provisional Patent Application No. 63/078,482, filed September 15, 2020, entitled NOVEL HIV-BINDING PEPTIDES for treating, preventing and reducing the risks of HIV, including all patents issuing therefrom and any foreign counterparts thereof.

Also on November 30, 2020, Virogentics, Inc., a wholly-owned subsidiary of Enzolytics, Inc., entered into a Patent License Agreement with the Zhabilov Trust in order to license the U.S. Patent No. 7,479538, entitled Irreversibly - Inactivated pepsinogen fragment and Pharmaceutical composition the same for detecting preventing and treating HIV; U.S. Patent No. 8,066982, Irreversibly - Inactivated pepsinogen fragment and Pharmaceutical composition compressing the same for detecting preventing and treating HIV, including all patents issuing therefrom and any foreign counterparts thereof.

<u>Provisional Patent for Immunotherapy Treatment of Multiple Sclerosis</u>

On December 9, 2020 the company filed a provisional patent with the U.S. Patent Office for an Immunotherapy treatment of Multiple Sclerosis developed by Harry Zhabilov, titled NUCLEAR PROTEINS ISOLATED FROM MAMALIAN SPINAL CORD (SCNP) IMMUNE FACTOR, Ser. No. 62/123341. The Company received confirmation of filing from the U.S. Patent Office on December 10, 2020.

<u>Engagement of BTS Research for Planned Toxicity Test</u>

On December 14, 2020 the Company engaged SAMM SOLUTIONS, INC. (DBA BTS Research), through a Master Service Agreement ("MSA"), to conduct a toxicity study on the Company's Flagship compound ITV-1. The Company has previously tested the compound in successful Clinical Trials in Bulgaria, but FDA regulations require separate Toxicity tests before an Investigational New Drug process may begin in the United States. The Company is still in the planning stages and based on the Mutual Recognition Agreement between the European Medicines Agency and the U. S, Federal Drug Administration may pre-empt the need for additional planned toxicity study.

<u>Texas A&M Facilities</u>

Effective December 1, 2020, the Company entered into a lease with Texas A & M University for office and laboratory space on the campus of Texas A&M University in the University's Institute for Preclinical Studies in order to expand the Company's development capabilities for the production of additional monoclonal antibodies.

B. Please list any subsidiaries, parents, or affiliated companies.

The Company is a 49% owner of the Bulgarian entity IMMB BG, which holds a sub-license agreement issued by ENZC for the proprietary immunotherapy treatment.

The Company is 100% owner of Biogenysis, Inc.
The Company is 100% owner of Virogentics, Inc.
The Company is 100% owner of ENZC Sub., Inc.
The Company is 100% owner of BioClonetics Immunotherapy, Inc.

C. Describe the issuers' principal products or services, and their markets.

The Company's products consist of two distinct drug development proprietary technologies: Immunotherapy and fully human monoclonal antibodies.

Enzolytics has proprietary technology for creating human cell lines that produce fully human monoclonal antibodies against numerous infectious diseases, including HIV-1, Hepatitis (A, B, C), rabies, influenza A and B, tetanus and diphtheria. The Company's technology for producing fully human monoclonal antibodies is now being employed to produce anti-SARS-CoV-2 (Coronavirus) monoclonal antibodies for treating COVID-19. The Company plans to employ its technology to subsequently produce fully human monoclonal antibodies for treating HIV-2, anthrax, smallpox, H1N1 Influenza, herpes zoster, varicella zoster, Rh (+) auto-immune disease and the Ebolavirus.

The Company is in the final development of the recombinant of the parent anti-HIV monoclonal antibody (identified as "Clone 3") which has been shown in *in vitro* tests conducted in 5 international laboratories to fully neutralized over 95% of all strains and viral subtypes of HIV-1 against which it was tested. The basis for its broad-spectrum efficacy is the fact that Clone 3 antibody targets an immutable epitope on the HIV virus. The targeted epitope has remained present in 98% (either directly or by way of conserved substitutions) of the 87,336 HIV isolates now known which have been analyzed by the Company using Artificial Intelligence (AI).

Using AI, the Company has also identified 8 additional conserved sites on the HIV-1 virus, some with over 98% conserved sequences, against which the Company plans to produce anti-HIV monoclonal antibodies. Production of multiple antibodies targeting different conserved and expectedly immutable sites comports with experts' conclusion that an effective treatment for HIV and the Coronavirus will likely require the administration of multiple monoclonal additional antibodies. Effective monoclonal antibodies will be those that target conserved and expectedly immutable virus sites. Producing targeted antibodies will result in the production of a therapeutic that will not be rendered ineffective due to mutation (variants) of the virus. In other words, even a "variant form of the virus" will expectedly contain the immutable targeted sites. Targeting immutable sites avoids the ineffectiveness that is experienced when a therapeutics or vaccine targets a site that nutates.

While the Company's HIV therapeutics may be used as an immunotherapeutic treatment for individuals with HIV/AIDS, they may also be developed for use as a prophylactic and therapeutic vaccine to prevent uninfected populations from contracting the HIV virus. Treatment using the fully human anti-HIV antibody will be far superior to current antiretroviral therapy for several significant reasons: (1) the therapy will be non-toxic (without damage to the kidneys and liver) and will not cause bone density deterioration (osteopenia and osteoporosis) -- as does antiretroviral treatments, (2) will not require lifetime treatment and (3) will be far less expensive.

Using its proprietary methodology, the Company is also producing anti-SARS-CoV-2 monoclonal antibodies and has identified 11 conserved, expectedly immutable epitopes on the Coronavirus against which it plans to produce targeted monoclonal antibodies. Using AI, the Company has screened the 50,512 Coronavirus isolates currently known and has identified conserved sites which expectedly are immutable. The 11 conserved sequences identified on the virus isolates curated have been identified on the basis that they are 98.71% to 99.29% conserved over the entirety of the 50,512 Coronavirus isolates analyzed by the Company using AI.

Comprehensive patent protection covering these discoveries, relating to HIV and the Coronavirus, have been filed in the U.S. and will be extended to international coverage under the Patent Cooperation Treaty (PCT). The patent coverage sought includes patent claims on the discovered epitope/antigens, vaccine claims, antibody claims, and related prophylactic/therapeutic method claims relating to the epitope/antigens.

The Coronavirus treatment drug market is expected to grow from 15.9 billion in 2020 to over $49.2 billion in 2027. The HIV Drug Market is expected to reach $36.49 billion by 2027 and market for treatment of Multiple Sclerosis is projected to exceed $40.66 billion by 2027 for a total market size of $126.35 billion for the treatments under development, The Company expects, aided by the continued use of AI, further expansion of its pipeline of additional treatments for other life threatening and debilitating viruses.

## 6)    Issuer's Facilities

The goal of this section is to provide a potential investor with a clear understanding of all assets, properties or facilities owned, used or leased by the issuer.

In responding to this item, please clearly describe the assets, properties or facilities of the issuer, give the location of the principal plants and other property of the issuer and describe the condition of the properties.  If the issuer does not have complete ownership or control of the property (for example, if others also own the property or if there is a mortgage on the property), describe the limitations on the ownership.

If the issuer leases any assets, properties or facilities, clearly describe them as above and the terms of their leases.

The Company leases a 380 sq ft facility located at 2000 North Central Expressway Plano Texas 75074 for $650.00 per month. The lease is for a one-year period ending on March 31, 2021. All lease payments are current.

In addition, the Company leases a 695 sq ft office and laboratory facility located at 800 Raymond Stotzer Parkway Building 1904, Suite 2106, College Station, Texas 77843 for $2,595.00 per month. The lease is for a one-year period ending in December 2021. All lease payments are current.

## 7)    Company Insiders (Officers, Directors, and Control Persons)

The goal of this section is to provide an investor with a clear understanding of the identity of all the persons or entities that are involved in managing, controlling or advising the operations, business development and disclosure of the issuer, as well as the identity of any significant or beneficial shareholders.

Using the tabular format below, please provide information, as of the period end date of this report, regarding any person or entity owning 5% of more of any class of the issuer's securities, as well as any officer, and any director of the company, regardless of the number of shares they own. **If any listed are corporate shareholders or entities, provide the name and address of the person(s) beneficially owning or controlling such corporate shareholders, or the name and contact information of an individual representing the corporation or entity in the note section.**

| Name of Officer/Director or Control Person | Affiliation with Company (e.g. Officer/Director/Owner of more than 5%) | Residential Address (City / State Only) | Number of shares owned | Share type/class | Ownership Percentage of Class Outstanding | Note |
|---|---|---|---|---|---|---|
| Harry Zhabilov | CFO and CSO | Frisco, TX | 190,750,000 | Series B | 42.84% | |
| Zhabilov Trust<br><br>Diana Zhabilov Trustee | Shareholder | Frisco, TX | 18,900,000<br><br>231,000,000 | Series A<br><br>Common | 31.50%<br><br>8.26% | |

| Charles Cotropia | CEO | Heath, TX | 86,882,750 | Series B | 19.52% | |
| | | | 14,917,500 | Series A | 24.86% | |
| | | | 98,175,000. | Common | 3.51% | |
| Joseph Cotropia | CSO | College Station, TX | 86,882,750 | Series B | 19.52% | |
| | | | 14,917,500 | Series A | 24.86% | |
| | | | 98,175,000 | Common | 3.51% | |
| Gaurav Chandra | CSO | Cape Town, South Africa+ | 30,664,500 | Series B | 6.89% | |
| | | | 5,265,000 | Series A | 8.78% | |
| | | | 34,650,000 | Common | 1.24% | |

## 8) Legal/Disciplinary History

A. Please identify whether any of the persons listed above have, in the past 10 years, been the subject of:

   1. A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses); **none**

   2. The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities; **none**

   3. A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; **none**

   4. The entry of an order by a self-regulatory organization that permanently or temporarily barred, suspended, or otherwise limited such person's involvement in any type of business or securities activities. **none**

B. Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the issuer or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities. **none**

## 9) Third Party Providers

Please provide the name, address, telephone number and email address of each of the following outside providers:

Securities Counsel
Name:        Morgan Petitti
Firm:        Morgan E. Petitti, ESQ
Address 1:   118 W. Streetsboro Rd.
Address 2:   Hudson, Ohio 44236
Phone:       330-697-5848
Email:       PetittiLaw@gmail.com

Accountant or Auditor

| | |
|---|---|
| Name: | Jona Barnes, E.A. Partner |
| Firm: | Mallet & Barnes Tax Service |
| Address 1: | 6136 Mission Gorge Road Suite 125 |
| Address 2: | San Diego, CA 92120 |
| Phone: | (619) 326-0840 |
| Email: | jonabarnes117@gmail.com |

| | |
|---|---|
| Name: | Leah Gonzales |
| Firm: | Malonebailey, LLP |
| Address 1: | 9801 Wetheimer Rd. Suite 1100 |
| Address 2: | Houston, TX 77402 |
| Phone: | 713-343-3468 |
| Email: | lgonzales@malone-bailey.com |

Investor Relations  N/A

Name:
Firm:
Address 1:
Address 2:
Phone:
Email:

Other Service Providers

Provide the name of any other service provider(s) that **that assisted, advised, prepared or provided information with respect to this disclosure statement**. This includes counsel, advisor(s) or consultant(s) or provided assistance or services to the issuer during the reporting period.

Name:
Firm:
Nature of Services:
Address 1:
Address 2:
Phone:
Email:

**10)**   **Issuer Certification**

*Principal Executive Officer:*

The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles but having the same responsibilities).

The certifications shall follow the format below:

I, Charles Cotropia, certify that:

1. I have reviewed this December 31, 2020 Year Ended Disclosure Statement of Enzolytics, Inc.;

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

March 29, 2021

/s/ Charles Cotropia, CEO

(Digital Signatures should appear as "/s/ [OFFICER NAME]")

*Principal Financial Officer:*

I, Harry Zhabilov certify that:

1. I have reviewed this this December 31, 2020 Year End Disclosure Statement of Enzolytics, Inc.;

2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

March 29, 2021

/s/ Harry Zhabilov, CFO

(Digital Signatures should appear as "/s/ [OFFICER NAME]")

# Supplemental Information Relating to Share Issuance History of Enzolytics, Inc. Common Shares

The following information has been extracted from OTC Quarterly and Annual Reports. This information is being offered to help the public analyze the equity issues of conversions, dilution, and other topics about which the public may have interest.

This information lists each original common stock issuance of Enzolytics, Inc. ("ENZC" or the "Company"), and its predecessors, from April 6, 2012 through October 15, 2020.   There have been no original issuance of ENZC shares since October 15, 2020. ENZC is a Delaware Corporation that filed a reorganization merger under 251g of the Delaware Corporate Statute on November 16, 2020.  All outstanding debt of the Company flowed to its subsidiary, now known as Robustomed, Inc.  This means there are no outstanding convertible debt pieces of ENZC common equity, and that has been the case since November 30, 2020.  This has been disclosed in all filings made on OTC (both annual and quarterly) since that date.

On the attached schedule, it is possible to track the issuances of common shares and the increases in the public float. The largest increase in originally issued shares and increase in public float occurred in the period between September 18, 2018 and October 9, 2020 originating from a Section 3(a) (10) of the Securities Act of 1933 program that was filed and approved in Federal Court in early 2018 and the associated convertible fee note. From this 3(a)(10) transaction the issued and outstanding shares increased in 2018 by 10,000,000; increased in 2019 by 235,023,000; and increased by 919,998,256 in 2020. Each new issuance under the 3(a)(10) increased the float in the same years and by the same number of shares as the Federal Court approved settlement.  This settlement required the original shares be issued with no restrictive legend. The total increase in original issued shares and public float during this two-year period was 1,165,021,256. Total float at December 31, 2020 was 1,670,830,512. Livingston Asset Management held no position in ENZC shares at December 1, 2020. The shares from the 3(a)(10) and fee note transferred from Livingston Asset Management to the general public at prices presumably below .0145 by open market sales. No Dilution has occurred since October 15, 2020, when the total issued reached 2,797,935,953. Float has increased as shareholders who were issued original issuance of ENZC shares met the SEC requirements for removing the restrictive legends and obtained an opinion letter from a SEC approved attorney acceptable to the Transfer Agent representing the Company. With each increase in Float the total Restricted shares decreased in the same amount. As of December 31, 2021 there were 451,289,565 restricted shares remaining of the 2,797,935,953 originally issued prior to October 15, 2020. Approximately 71 million of these restricted shares are part of a lawsuit filed by the Company. The remaining 380,289,565 have met the SEC requirement for removal of the restrictive legends but have either not elected to or been unable to obtain an opinion letter acceptable to the transfer agent or are held by Officers and directors of the Company.

31

**Transefer Agent Issuance History**

| | | | | | | Total Outstanding Shares |
|---|---|---|---|---|---|---|
| Authorized Shares: | | 3,000,000,000 | | | | 2,797,935,953 |
| Par Value: | | $0.00001 | | | | |

| Date | Type | Shareholder Name | Cert No. | Shares Issued | Shares Returned | Cumulative Shares Outstanding | Float | Restricted Shares |
|---|---|---|---|---|---|---|---|---|
| 04/06/12 | | Began as Transfer Agent | | 561,942,805 | | 561,942,805 | | |
| 02/07/13 | | 500 to 1 Reverse Split | | | 560,818,829 | 1,123,976 | | |
| 03/08/13 | RndUp | Cede & Co | 4024 | 7 | | 1,123,983 | | |
| 03/29/13 | RndUp | Cede & Co | 4028 | 175 | | 1,124,158 | | |
| 10/29/13 | 144 | Woodward, Charles | 4034 | 400,000 | | 1,524,158 | | |
| 10/29/13 | 144 | Mazzone, Andrew B | 4035 | 800,000 | | 2,324,158 | | |
| 10/29/13 | 144 | Advanta Management | 4036 | 7,000,000 | | 9,324,158 | | |
| 10/29/13 | 144 | Arenella, Christine | 4037 | 500,000 | | 9,824,158 | | |
| 10/29/13 | 144 | Aiello, Jennifer | 4038 | 500,000 | | 10,324,158 | | |
| 10/29/13 | 144 | Aiello, Jr Peter | 4039 | 500,000 | | 10,824,158 | | |
| 10/29/13 | 144 | Gates, Jeffrey | 4040 | 7,000,000 | | 17,824,158 | | |
| 10/29/13 | 144 | Suarez, Antonio | 4041 | 15,000 | | 17,839,158 | | |
| 01/06/14 | 144FT | Infotainment Marketing | 4043 | 1,150,000 | | 18,989,158 | | |
| 01/06/14 | 144FT | Scoratow, Jay | 4044 | 250,000 | | 19,239,158 | | |
| 01/06/14 | 144FT | Caspi, Steve | 4045 | 100,000 | | 19,339,158 | | |
| 02/11/14 | 144 | JLA Realty Associates | 4046 | 200,000 | | 19,539,158 | | |
| 02/11/14 | 144 | JLA Realty Associates | 4047 | 100,000 | | 19,639,158 | | |
| 02/27/14 | 144 | Shehebar, Isaac | 4048 | 500,000 | | 20,139,158 | | |
| 07/09/14 | 144 | Voris, John S & Deborah L | 4049 | 100,000 | | 20,239,158 | | |
| 07/09/14 | 144 | Murch, Tom & Brenda | 4050 | 400,000 | | 20,639,158 | | |
| 01/28/15 | 144 | Mazzone, Andrew B | 4051 | 4,000,000 | | 24,639,158 | | |
| 01/28/15 | 144 | Advanta Management | 4052 | 4,000,000 | | 28,639,158 | | |
| 01/28/15 | 144 | Gates, Jeffrey | 4053 | 4,000,000 | | 32,639,158 | | |
| 01/28/15 | 144 | Roskinski, Robert | 4054 | 3,000,000 | | 35,639,158 | | |
| 01/28/15 | 144 | Wegner, Randy | 4055 | 3,000,000 | | 38,639,158 | | |
| 01/28/15 | 144 | Barrington, Rodney | 4056 | 4,000,000 | | 42,639,158 | | |
| 01/28/15 | 144 | Barrington, Paula | 4057 | 4,000,000 | | 46,639,158 | | |
| 02/03/15 | 144 | Mazzone, Andrew B | 4058 | 4,000,000 | | 50,639,158 | | |
| 02/03/15 | 144 | Advanta Management | 4059 | 4,000,000 | | 54,639,158 | | |
| 02/03/15 | 144 | Gates, Jeffrey | 4060 | 4,000,000 | | 58,639,158 | | |
| 02/03/15 | 144 | Rosinski, Robert | 4061 | 4,000,000 | | 62,639,158 | | |
| 02/03/15 | 144 | Wegner, Randy | 4062 | 4,000,000 | | 66,639,158 | | |
| 02/03/15 | 144 | Barrington, Rodney | 4063 | 4,000,000 | | 70,639,158 | | |
| 02/03/15 | 144 | Barrington, Paula | 4064 | 4,000,000 | | 74,639,158 | | |
| 02/05/15 | 144 | Senior Management | 4065 | 8,000,000 | | 82,639,158 | | |
| 02/05/15 | 144 | CKM Corporate Inc | 4066 | 8,000,000 | | 90,639,158 | | |
| 02/05/15 | 144 | Remo, Ernest | 4067 | 8,000,000 | | 98,639,158 | | |
| 02/11/15 | 144 | Cimarron Capital Ltd | 4072 | 3,000,000 | | 101,639,158 | | |
| 02/12/15 | 144FT | Mergenthaler, Peter | 4073 | 10,000,000 | | 111,639,158 | | |
| 05/26/17 | 144FT | Southridge Partners II | 4099 | 9,414,312 | | 121,053,470 | | |
| 10/25/17 | 144 | Cimarron Capital Ltd | 4119 | 500,000 | | 121,553,470 | | |
| 01/08/18 | 144 | A2 Carved in Stone | 4122 | 1,000,000 | | 122,553,470 | | |
| 01/18/18 | | Decreased authorized from 1,000,000,000 to 950,000,000 | | | | 122,553,470 | | |
| 02/27/18 | 144 | Hui, Hongxiang | 4126 | 100,000 | | 122,653,470 | | |
| 03/06/18 | 144 | Valchanov, Daniel Antonov | 4127 | 3,050,000 | | 125,703,470 | | |
| 03/06/18 | 144 | Dimitrova, Vesselka M | 4128 | 10,000,000 | | 135,703,470 | | |
| 03/06/18 | 144 | Dimitrova, Vesselka M | 4129 | 10,000,000 | | 145,703,470 | | |
| 03/06/18 | 144 | Mt Rose Corporation | 4130 | 20,000,000 | | 165,703,470 | | |
| 03/06/18 | 144 | Mt Rose Corporation | 4131 | 20,000,000 | | 185,703,470 | | |
| 03/06/18 | 144 | Mt Rose Corporation | 4132 | 20,000,000 | | 205,703,470 | | |
| 03/06/18 | 144 | Mt Rose Corporation | 4133 | 20,000,000 | | 225,703,470 | | |
| 03/06/18 | 144 | Mt Rose Corporation | 4134 | 20,000,000 | | 245,703,470 | | |
| 03/06/18 | 144 | Dimitrov, Milen V | 4135 | 5,000,000 | | 250,703,470 | | |
| 03/06/18 | 144 | Dimitrov, Milen V | 4136 | 5,000,000 | | 255,703,470 | | |
| 03/06/18 | 144 | Angelova, Mariya S | 4137 | 40,000 | | 255,743,470 | | |
| 03/06/18 | 144 | Trichov, Milen Vasilev | 4138 | 25,000 | | 255,768,470 | | |
| 03/06/18 | 144 | Trichov, Milen Vasilev | 4139 | 20,000 | | 255,788,470 | | |
| 03/06/18 | 144 | Rudarski, Yavor Ivanov | 4140 | 20,000 | | 255,808,470 | | |
| 03/06/18 | 144 | Iliev, Rossen Hristov | 4141 | 200,000 | | 256,008,470 | | |
| 03/06/18 | 144 | Georgiev, Konstantin G | 4142 | 50,000 | | 256,058,470 | | |
| 03/06/18 | 144 | Lipkovski, Martin | 4143 | 750,000 | | 256,808,470 | | |
| 03/06/18 | 144 | Belchev, Konstantin M | 4144 | 40,000 | | 256,848,470 | | |
| 03/06/18 | 144 | Tsoklinova, Kamelya G | 4145 | 2,500,000 | | 259,348,470 | | |
| 03/06/18 | 144 | Ivanov, Luchezar B | 4146 | 2,500,000 | | 261,848,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4147 | 500,000 | | 262,348,470 | | |

32

| Date | Type | Name | Number | Amount | Amount2 | Balance | Col8 | Col9 |
|---|---|---|---|---|---|---|---|---|
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4148 | 200,000 | | 262,548,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4149 | 10,000,000 | | 272,548,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4150 | 5,000,000 | | 277,548,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4151 | 2,000,000 | | 279,548,470 | | |
| 03/06/18 | 144 | Siderov, Volen Nikolov | 4152 | 3,000,000 | | 282,548,470 | | |
| 03/06/18 | 144 | Siderova, Denitsa S | 4153 | 3,500,000 | | 286,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4154 | 50,000,000 | | 336,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4155 | 200,000 | | 336,248,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4156 | 200,000 | | 336,448,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4157 | 200,000 | | 336,648,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4158 | 200,000 | | 336,848,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4159 | 200,000 | | 337,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4160 | 200,000 | | 337,248,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4161 | 200,000 | | 337,448,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4162 | 200,000 | | 337,648,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4163 | 200,000 | | 337,848,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4164 | 200,000 | | 338,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4165 | 200,000 | | 338,248,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4166 | 200,000 | | 338,448,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4167 | 200,000 | | 338,648,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4168 | 200,000 | | 338,848,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4169 | 200,000 | | 339,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4170 | 200,000 | | 339,248,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4171 | 200,000 | | 339,448,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4172 | 200,000 | | 339,648,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4173 | 200,000 | | 339,848,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4174 | 200,000 | | 340,048,470 | | |
| 03/06/18 | 144 | Savov, Dimitar Slavchev | 4175 | 200,000 | | 340,248,470 | | |
| 03/06/18 | 144 | Radivoeva, Mariya S | 4176 | 5,000,000 | | 345,248,470 | | |
| 03/22/18 | N/C | Eco-Petroleum Solutions Inc changed its name to Enzolytics Inc | | | | 345,248,470 | | |
| 03/23/18 | 144 | Zhabilov, Dannie TTEE | 4177 | 175,000,000 | | 520,248,470 | 64,408,885 | 455,839,585 |
| 04/16/18 | 144 | Zhabilov, Dannie TTEE | 4178 | 200,000,000 | | 720,248,470 | | |
| 04/20/18 | 144 | A2 Carved in Stone | 4179 | 4,000,000 | | 724,248,470 | | |
| 05/08/18 | RTT | Zhabilov, Dannie TTEE | 4178 | | 200,000,000 | 524,248,470 | | |
| 05/25/18 | 144 | Ivanov, Luchezar B | 4181 | 20,000,000 | | 544,248,470 | | |
| 07/18/18 | 144 | Zhabilov, Dannie TTEE | 4182 | 100,000,000 | | 644,248,470 | | |
| 08/24/18 | 144 | Zhabilov, Dannie TTEE | 4184 | 137,000,000 | | 781,248,470 | | |
| 08/28/18 | 144 | Moreno, Francis De A S | 4185 | 10,000,000 | | 791,248,470 | | |
| 08/28/18 | 144 | Cimarron Capital Ltd | 4186 | 4,500,000 | | 795,748,470 | | |
| 09/05/18 | 144 | Bagdasarian, Andranik | 4187 | 10,000,000 | | 805,748,470 | | |
| 09/25/18 | 144FT | Livingston Asset Management | 4188 | 10,000,000 | | 815,748,470 | | |
| 09/27/18 | | Increased authorized from 950,000,000 to 1,500,000,000 | | | | 815,748,470 | 74,408,885 | 741,339,585 |
| 10/11/18 | 144 | Eran, Harutyan | 4190 | 2,000,000 | | 817,748,470 | 78,908,885 | 738,839,585 |
| 01/24/19 | 144FT | Queenston Partners LP | 4195 | 66,376,000 | | 884,124,470 | | |
| 02/07/19 | 144FT | Queenston Partners LP | 4197 | 72,660,000 | | 956,784,470 | | |
| 02/13/19 | 144FT | Tynan, William | 4198 | 13,248,889 | | 970,033,359 | 231,193,774 | 738,839,585 |
| 06/30/19 | | | | | | 970,033,359 | 231,193,774 | 738,839,585 |
| 09/30/19 | | | | | | 970,033,359 | 231,193,774 | 738,839,585 |
| 12/06/19 | 144FT | Livingston Asset Management | 4204 | 38,762,000 | | 1,008,795,359 | | |
| 12/18/19 | 144FT | Livingston Asset Management | 4205 | 57,225,000 | | 1,066,020,359 | 327,180,774 | 738,839,585 |
| 01/22/20 | 144FT | Livingston Asset Management | 4208 | 51,392,000 | | 1,117,412,359 | | |
| 01/29/20 | 144FT | Livingston Asset Management | 4209 | 47,000,000 | | 1,164,412,359 | | |
| 01/29/20 | 144FT | Sky-Direct LLC | 4210 | 63,972,603 | | 1,228,384,962 | | |
| 03/12/20 | 144FT | Livingston Asset Management | 4214 | 114,444,000 | | 1,342,828,962 | 603,989,377 | 738,839,585 |
| 04/13/20 | | Livingston Asset Management | | 105,137,700 | | 1,447,966,662 | | |
| 06/04/20 | | Livingston Asset Management | | 68,534,900 | | 1,516,501,562 | | |
| 06/18/20 | | Livingston Asset Management | | 31,308,550 | | 1,547,810,112 | | |
| 06/25/20 | | Livingston Asset Management | | 48,616,000 | | 1,596,426,112 | 857,586,527 | 738,839,585 |
| 07/09/20 | | Livingston Asset Management | | 100,403,400 | | 1,696,829,512 | | |
| 07/14/20 | | Livingston Asset Management | | 57,882,900 | | 1,754,712,412 | | |
| 07/16/20 | | Livingston Asset Management | | 100,567,400 | | 1,855,279,812 | | |
| 08/20/20 | | Livingston Asset Management | | 138,571,000 | | 1,993,850,812 | | |
| 08/26/20 | | Fred Allen Cole | | 10,000,000 | | 2,003,850,812 | | |
| 08/26/20 | | Barrett Akers | | 15,000,000 | | 2,018,850,812 | | |

33

| Date | Name | Amount | Total | | |
|------|------|--------|-------|---|---|
| 09/09/20 | Maurice Nazarian | 4,000,000 | 2,022,850,812 | | |
| 09/18/20 | Sky_Direct | 195,795,288 | 2,218,646,100 | | |
| 09/22/20 | SeaCorp | 203,149,447 | 2,421,795,547 | | |
| 09/22/20 | Livingston Asset Management | 16,874,550 | 2,438,670,097 | 1,670,830,512 | 767,839,585 |
| | | | | | |
| 10/14/20 | Harry Zhabilov | 50,000,000 | 2,488,670,097 | | |
| 10/14/20 | Camelot Nevada Trust | 70,000,000 | 2,558,670,097 | | |
| 10/15/20 | SeaCorp | 200,000,000 | 2,758,670,097 | | |
| 10/09/20 | livingstom | 39,265,856 | 2,797,935,953 | | |

No new issuances after this date

| | Float in 2021. | | | | |
|------|------|--------|-------|---|---|
| 12/31/20 | no dilution | | 2,797,935,953 | 1,670,830,512 | 1,127,105,441 |
| 03/31/21 | no dilution | | 2,797,935,953 | 1,880,313,464 | 917,622,489 |
| 06/30/21 | no dilution | | 2,797,935,953 | 2,141,602,954 | 656,332,999 |
| 09/30/21 | no dilution | | 2,797,935,953 | 2,288,596,368 | 509,339,585 |
| 12/31/21 | no dilution | | 2,797,935,953 | 2,346,646,388 | 451,289,565 |

34

| State of Connecticut | ) | **PETER MERGENTHALER AFFIDAVIT REGARDING** |
|---|---|---|
| | ) | **THE FRAUDULENT TRANSFER OF 10,000,000 OF HIS** |
| County of New Haven | ) | **ECO PETROLEUM SOLUTIONS, INC. SHARES** |

Peter Mergenthaler being first duly sworn under oath states and alleges as follows:

1. I have personal knowledge of the following facts which I believe to be true and correct in all material respects.
2. Attached under cover of "Exhibit A" is a true and correct copy of a February 5, 2015 letter bearing my signature which my attorney recently obtained from Nevada Agency and Transfer Company.
3. The signature on Exhibit A is not genuine. Said differently, that signature is not mine. It is a forgery.
4. American Asset Management Services Corp is the only addressee on Exhibit A whom I know. I do not know of nor have I heard of the remaining addressees.
5. Attached under cover of "Exhibit B" is a true and correct copy of a February 12, 2015 Stock Power bearing my signature which my attorney recently obtained from Nevada Agency and Transfer Company.
6. The signature on Exhibit B is not genuine. Said differently, that signature is not mine. It is a forgery.
7. I did not in February 2015 or at any other time authorize or consent to the transfer of any transfer of my ECO Petroleum Solutions, Inc. shares to any of the transferees listed in the Exhibit B Stock Power.
8. I make this affidavit for the purpose of recovering 10,000,000 ECO Petroleum Solutions, Inc. shares which are my property that had been stolen from me.

Further your affiant saith not.

_____
Peter Mergenthaler

Subscribed and sworn to before me
this _12_ day of May 2021.

_____
Notary Public    Wendy Stach

Oct 31, 2022

35

07/03/2012  08:21

#6096 P.001 /001

# PETER MERGENTHALER
3 WOOD EDGE COURT
WATER MILL, NY 11976
561.302.1850 fax 631.283.7919
pmergenthaler@hotmail.com



RECEIVED

FEB 10 2015

NEVADA AGENCY AND
TRANSFER COMPANY

February 5, 2015

Tiffany Baxter
Transfer Agent Manager
Nevada Agency and Transfer Company
50 West Liberty Street, Suite 880
Reno, NV 89501

Re: Eco Petroleum Solutions, Inc. (the "Company")

Dear Mrs. Baxter:

Please be advised that a total of 10,000,000 shares are to be issued in the name of
Peter Mergenthaler. Please consider this my formal instructions with respect to the
issuance of said shares, as set forth below.

Sage Market Advisors                          2,500,000 shares
1171 Lawrence Avenue
Westfield, NJ 01090
26-3254985

M Lamar Outz                                   1,000,000 shares
121 Erstine Drive
Warner Robins, GA 31093
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

OMS Consulting, Inc.                           1,500,000 shares
1400 SW 25th Ave
Boynton Beach, FL 33426
47-3031223

American Asset Management Services Corp.        5,000,000 shares
C/o 187 Smithtown Blvd
Nesconset, NY 11767
47-1291267

Please deliver all certificates to the Company at its usual address. Please feel free
to contact me if you have any questions.

Very truly yours,

Peter Mergenthaler

**36**

page 1



RECEIVED

FEB 13 2015

NEVADA AGENCY AND
TRANSFER COMPANY

# STOCK POWER

NOTICE:  Signature must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank (other than  saving bank), or a trust company.
The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to
applicable laws or regulations

| | |
|---|---|
| TEN COM - as tenants in common | UNIF GIFT MIN ACT - .... Custodian.... ........ |
| TEN ENT - as tenants by the entireties | (Cust)          (Minor) |
| JT TEN - as joint tenants with right of survivorship | Under Uniform Gifts to Minors |
| and not as tenants in common | Act ......................... |
| | (State) |

Additional abbreviations may also be used though not in the above list

For Value Received *PETER MRAGENTHALER* hereby sell, assign and transfer unto

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

    *OMS Consulting, Inc.*
    *Sage Market Advisors*
    *M. Lamar Oate*
*AMERICAN MANAGEMENT SERVICES CORP*
*185 SMITHTOWN BLVD, NESCONSET, 11767*
[PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE]

        *RCO PETROLEUM SOLUTIONS, INC*

            *10,000,000* _____ Shares
of the capital stock represented by the within certificate, and do hereby irrevocably constitute
and appoint

        *NEVADA AGENCY* _____ Attorney
to transfer the said stock on the books of the within named Corporation with full power of
substitution in the premises.

Dated *2-12-2015*

(INK
SCAN

NOTICE:  THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN
EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER

SIGNATURE GUARANTEED:
Signature(s) must be guaranteed by a firm which is a member of a registered national stock exchange, or by a bank
(other than a savings bank) or a trust company.  The guaranteeing firm must be a member of the Medallion
Guarantee Program.

37

7-6-15

 **eco petroleum solutions inc.**

110 Smithtown Blvd.
Suite 3
Nesconset, NY 11767
(631) 257-5454

July 6, 2015

Board of Directors
Eco Petroleum Solutions, Inc.
110 Smithtown Blvd., Ste 3
Nesconset, NY 11767

> **Re:** **Eco Petroleum Solutions, Inc. (the "Company")**

Dear Sirs:

Please be advised that I hereby resign as Vice-President and as a Director of Eco Petroleum Solutions, Inc., effective the date of this Correspondence.

My resignation does not in any way imply or infer that there is any dispute or disagreement relating to the Company's operations, policies or practices.

Sincerely,

/s/
James W. Zimbler

38

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PETER MERGENTHALER,

      Plaintiff,

     v.

ENZOLYTICS, INC., A DELAWARE
CORPORATION, SUCCESSOR IN
INTEREST TO ECO PETROLEUM
SOLUTIONS, INC., A DELAWARE
CORPORATION, SUCCESSOR IN
INTEREST TO STRUCTURAL
ENHANCEMENTS, INC. A DELAWARE
CORPORATION,

      Defendant.

Civil Action No. 21-1163-RGA

## MEMORANDUM OPINION

Jamie L. Edmonson, ROBINSON & COLE LLP, Wilmington, DE; Mark J. Kallenbach,
Minneapolis, MN.

    Attorneys for Plaintiff.


Antranig Garibian, GARIBIAN LAW OFFICES, P.C., Wilmington, DE.

    Attorney for Defendant.




August 17, 2022

**39**

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Defendant's motion to dismiss pursuant to Rule 12(b)(6) (D.I. 7) and Plaintiff's cross-motion for the court to set bond and compel Defendant to reissue shares pursuant to Plaintiff posting bond. (D.I. 17). I have reviewed the parties' briefing. (D.I. 8, 17, 20). For the reasons set forth below, Defendant's motion is GRANTED and Plaintiff's cross-motion is DENIED.

## I.  BACKGROUND

Plaintiff Peter Mergenthaler filed suit against Defendant Enzolytics, Inc. ("ENZC") on August 11, 2021, asserting, "[Defendant] should be ordered to reissue to [Plaintiff] 10,000,000 of its shares" pursuant to 6 Del. C. § 8-405. (D.I. 1 at ¶¶35-51, 51).

Plaintiff states that he owns 10,000,000 shares of ENZC, but that James W. Zimbler engaged in a scheme to fraudulently convert Plaintiff's shares to his and others' ownership. (*Id.* at ¶¶9-26). Specifically, Plaintiff states that, beginning in 2015, Zimbler orchestrated the fraudulent transfer of Plaintiff's shares in ECOP, which is a predecessor corporation of ENCZ, to Sage Market Advisors (2,500,000 shares), OMS Consulting, Inc. (1,500,000 shares), M. Lamar Outz (1,000,000 shares), and American Asset Management Services Corporation (5,000,000 shares). (*Id.* at ¶¶3, 22-26, 40). Zimbler owns American Asset Management Services Corporation, to which 5,000,000 of Plaintiff's shares were transferred. (*Id.* at ¶¶26, 41). At the time of this transfer, Zimbler was the vice president of ECOP. (*Id.* at ¶37). Zimbler resigned from his position at ECOP on July 6, 2015, after the conversion of Plaintiff's shares. (*Id.* at 38.)

Defendant requests that this court dismiss Plaintiff's suit pursuant to Rule 12(b)(6) for Plaintiff's failure to comply with 6 Del C. § 8-405. (D.I. 8). In a cross-motion, Plaintiff requests

**40**

that this court set a sufficient indemnity bond compliant with 6 Del. C. § 8-405(a)(2) and order Defendant to reissue 10,000,000 ENCZ shares to Plaintiff.  (D.I. 17 at 1, 7-8).

## II.    LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a)(2).  Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard.  A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.,* 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly,* 550 U.S. at 555).  I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002).  A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *See Johnson v. City of Shelby,* 574 U.S. 10, 11 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 12.  That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [accused] is liable for the misconduct alleged." *Id.*  Deciding whether a claim is plausible will be a "context-specific

**4 1**

task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.   DISCUSSION

I was concerned about whether I had subject matter jurisdiction (D.I. 21), which was alleged to be on the basis of diversity (D.I. 22, 23). Both sides argued that I did, but without citing any actual authority. The issue that I was concerned about was the relief sought— reissuing 10,000,000 shares of stock—did not appear to involve damages; it appeared to be analogous to issuing an injunction. But it appears, not surprisingly, that similar issues have been addressed before, with the conclusion that the value of the shares is the measure of the amount in controversy. "We have struggled before with the problem of determining the actual amount in controversy when plaintiffs request only declaratory or equitable relief. But here, it is clear that the shares of stock themselves are at issue and that the amount in controversy therefore depends on the value of those shares." *Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993) (citations omitted); *see Madison Stock Transfer, Inc. v. Exlites Holdings International, Inc.*, 368 F. Supp. 3d 460 (E.D. N.Y. 2019). At the time the suit was filed, it appears that ENZC stock was trading at about 16 cents per share, making the amount in controversy about $1,600,000.

To recap, the allegations are that in 2015, a third party converted Plaintiff's 10,000,000 shares of stock to various entities. Plaintiff learned of this in 2018. (D.I. 1 at ¶ 36). Plaintiff started to take some action to recover his converted stock in 2021. (*Id.* at ¶ 27). Later that year, he filed this suit. Plaintiff requests that I compel ENZC to reissue the shares to him pursuant to 6 Del. C. § 8-405(a)

Under 6 Del C. § 8-405(a), "If an owner of a certificated security, whether in registered or bearer form, claims that the certificate has been lost, destroyed, or wrongfully taken, the issuer

**42**

shall issue a new certificate if the owner: (1) so requests before the issuer has notice that the certificate has been acquired by a protected purchaser; (2) files with the issuer a sufficient indemnity bond; and (3) satisfies other reasonable requirements imposed by the issuer."

As to the merits, the case is lightly briefed. Neither side cites a single case interpreting 6 Del. C. § 8-405(a) or any closely analogous statute from any other state.

Defendant argues that this court should dismiss Plaintiff's Complaint because of Plaintiff's "failing to comply with the requirements of 6 Del C. § 8-405." (D.I. 8 at 4). Particularly, Defendant argues that Plaintiff failed to comply with 6 Del C. § 8-405(a)(2), because, "Plaintiff has not filed any indemnity bond," and Plaintiff's attempts to excuse himself from this failure are without support from any "statutory provision or legal principle." (*Id.* at 5).

In response, Plaintiff argues that he did not need to file an indemnity bond for three reasons. First, Plaintiff argues that he did not need to file an indemnity bond because Defendant has not acted in good faith as is required by 6 Del C. § 1-304 and, instead, has "refus[ed] to communicate" with Plaintiff. (D.I. 17 at 6-7). Plaintiff supports this contention based on allegations included in the declaration of Mark J. Kallenbach, which Plaintiff filed with its opposition brief. (D.I. 17 at 1-4, 6 (citing D.I. 18 (Kallenbach Declaration)); *see also* D.I. 1 at ¶¶27-30 (including factual allegations regarding the unresponsiveness of Plaintiff)). Second, Plaintiff argues that "no indemnity bond should be required of [Plaintiff]" because "[Defendant] can seek indemnification on [a] Kemark bond[,]" thereby making any bond Plaintiff must file according to 6 Del C. § 8-405(a)(2) redundant. (D.I. 17 at 7; *see also* D.I. 1 at ¶39). Third, Plaintiff argues, "If all of the protected purchasers [including Sage Market Advisors, OMS Consulting, Inc., and M. Lamar Outz] have sold all of their shares, then no bond should be required." (D.I. 17 at 7).

**43**

I find that Plaintiff failed to comply with 6 Del C. § 8-405(a)(2), and that this failure cannot be excused for the reasons Plaintiff argues.

As to Plaintiff's first argument, I do not find that Plaintiff should be excused from filing an indemnity bond based on Defendant's alleged bad faith conduct. As a preliminary matter, I find that Plaintiff did not plead sufficient factual content in his Complaint to support this argument. (*See* D.I. 20 at 2-4). Instead, in its opposition briefing, Plaintiff supports his argument by citing facts included in the later-filed Kallenbach Declaration. (*See* D.I. 17 at 1-4, 7 (citing D.I. 18); *see also Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 273 (3d Cir. 2016) ("[F]or purposes of Rule 12(b)(6), a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents.")). Moreover, the factual allegations included in Plaintiff's Complaint – though not cited in Plaintiff's opposition briefing – do not contain sufficient factual matter to show that Plaintiff acted in bad faith in its communications with Defendant. (*See* D.I. 1 at ¶¶27-30; *see also Ashcroft*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (cleaned up)).

Even considering the allegations presented in the Kallenbach Declaration as true and viewing them in the light most favorable to the complainant, I do not find that those allegations show that Defendant acted in bad faith. Instead, in the Kallenbach Declaration, the last listed communication between the parties was sent by Defendant's counsel, where counsel indicates the intention to "reconnect and have a conversation" with Plaintiff after conferring with the client. (D.I. 18, Ex. G (including email sent by Defendant's counsel to the Plaintiff's counsel on July 16, 2021)). On the current record, it is unclear whether conversations between the parties occurred

**44**

after July 16, 2021.   As I see it, Defendant was communicating with Plaintiff, and Plaintiff never raised his need to file a sufficient indemnity bond.[1]   For these reasons, even considering the declaration Plaintiff submitted after filing his Complaint, I find that Plaintiff failed to state a plausible claim that Defendant acted in bad faith in its communications with Plaintiff.

I also note that the entire theory that good faith is relevant to the statutory requirements is not based on anything in the statute.  Rather, it is based on 6 Del. C. § 1-304, which states, "Every contract or duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement."  Until Plaintiff meets his obligations under § 8-405(a)(2), I am not sure how Defendant's good faith or lack thereof is relevant.

Regarding Plaintiff's second argument, I find no legal support that Plaintiff can avoid its requirement to file a sufficient indemnity bond pursuant to 6 Del C. § 8-405(a)(2) based on Defendant's alleged ability to independently indemnify itself through a "Kemark bond." (*See also* D.I. 20 at 5).  For that matter, Plaintiff does not make clear what a "Kemark bond" is or provide any support for this argument beyond attorney conjecture. (*See* D.I. 17 at 7).  Plaintiff's argument simply ignores the statute.

Regarding Plaintiff's third argument, I find that Plaintiff should not be excused from filing an indemnity bond because "it is possible that all protected purchasers [sold their shares]." (D.I. 17 at 7; *see also* D.I. 20 at 5).  In the Complaint, there are no allegations regarding whether the protected purchasers sold their shares.  But even if the protected purchases sold their shares, it would not provide a legal basis for Plaintiff to fall within an exception to 6 Del C. § 8-405(a)(2).

---

[1] While I have not done significant research, I do note that the Court of Chancery has at least implied that an appropriate indemnity bond might be set at the market value of the stock. *See Castro v. ITT Corp.*, 598 A.2d 674, 682-83 (Del. Ch. 1991) ("Assume a bond is fixed in an amount equal to the present market value of the stock . . . .").

45

For these reasons, I find that Plaintiff has not stated a plausible claim to relief that he complied with the requirement of 6 Del C. § 8-405(a)(2). "In light of the official explanation that section 8.405(b) incorporated into law the longstanding corporate practice of voluntarily reissuing certificates where a shareholder had satisfied certain reasonable requirements, and the assurance of court-ordered relief only where reasonable requirements have been satisfied and a sufficient indemnity bond supplied, [I find] that a shareholder cannot compel an issuer to give him a new certificate unless he has complied with all three requirements of section 8.405(b)." *Glaser v. Texon Energy Corp.*, 702 F.2d 569, 572 (5th Cir. 1983) (cleaned up). Thus, Plaintiff's Complaint is dismissed without prejudice. 

In the cross-motion, Plaintiff also argues that, if the court finds that the filing of a sufficient indemnity bond is required under 6 Del C. § 8-405(a)(2), "the question becomes that of the appropriate bond amount, which amount is in the discretion of the Court." (D.I. 17 at 7-8). I disagree and find no legal basis for the court to set a bond amount rather than to dismiss this Complaint. Presumably, Plaintiff can post an indemnity bond without a court order.

Because I am dismissing this Complaint for the above reasons, I need not address the other arguments made in the parties' briefing.

**IV.    CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss is **GRANTED**. Plaintiff's cross-motion is **DENIED**.

An appropriate order will issue.

46

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PETER MERGENTHALER,

     Plaintiff,

     v.

ENZOLYTICS, INC., A DELAWARE
CORPORATION, SUCCESSOR IN
INTEREST TO ECO PETROLEUM
SOLUTIONS, INC., A DELAWARE
CORPORATION, SUCCESSOR IN
INTEREST TO STRUCTURAL
ENHANCEMENTS, INC. A DELAWARE
CORPORATION,

     Defendant.

Civil Action No. 21-1163-RGA

## ORDER

For the reasons stated in the corresponding Memorandum Opinion, Defendant's motion

to dismiss (D.I. 7) is **GRANTED**, and Plaintiff's cross-motion (D.I. 17) is **DENIED**.

Entered this 17th day of August, 2022.

_____
United States District Judge

47

**ENZOLYTICS, INC. AND SUBSIDIARIES**
**BALANCE SHEETS**
**(Audited)**

|  | December 31, 2021 | December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 2,282,148 | $ 560,389 |
| A/R Related party - Patten Energy, Inc., net of allowance for doubtful accounts of $36,290 | - | - |
| **Total current assets** | 2,282,148 | 560,389 |
| **Property and equipment, net** | 150,548 | 5,063 |
| **Other assets:** | | |
| Deposit | 5,555 | 2,960 |
| Investment in Bulgarian Joint Venture | 800,000 | - |
| **Total other assets** | 805,555 | 2,960 |
| | $ 3,238,251 | $ 568,412 |
| **LIABILITIES AND SHAREHOLDERS' DEFICIT** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 254,023 | $ 222,584 |
| Accrued expenses and other current liabilities | 678,355 | 1,364,541 |
| Notes payable to investors, net of discount of $0 and $0 at December 31, 2021 and 2020, respectively | 667,300 | 417,300 |
| Crowdfunding convertible notes | 648,581 | 654,606 |
| Due to related parties: | | |
| Promissory note - Former director and officer | 35,000 | 35,000 |
| Officers, Directors and stockholders | 343,201 | 343,101 |
| License fee payable | 1,550,000 | 1,550,000 |
| Current liabilities - Discontinued Operations | 485,153 | 485,153 |
| **Total current liabilities** | 4,661,612 | 5,072,285 |
| **Total long term liabilities** | 866,452 | 866,452 |
| **Total liabilities** | 5,528,064 | 5,938,737 |
| **Shareholders' Equity/(Deficit)** | | |
| Preferred stock, Series A $.0001 par value; 100,000,000 shares authorized, 60,000,000 issued and outstanding at December 31, 2021 and 2020, respectively | 6,000 | 6,000 |
| Preferred stock, Series B $.0001 par value; 465,000,000 shares authorized, 447,180,000 and 445,180,000 issued and outstanding at December 31, 2021 and 2020, respectively | 44,718 | 44,518 |
| Preferred stock, Series C $.0001 par value; 465,000,000 shares authorized, 941,078 and 941,078 issued and outstanding at December 31, 2021 and 2020, respectively | 94 | 94 |
| Preferred stock, Series D $.0001 par value; 1,000,000 shares authorized, 0 and 0 issued and outstanding at December 31, 2021 and 2020, respectively | - | - |
| Preferred stock, Series E $.0001 par value; 10,000,000,000 shares authorized, 2,500,000 and 0 issued and outstanding at December 31, 2021 and 2020, respectively | 250 | - |
| Common stock, $.0001 par value; 3,000,000,000 shares authorized, 2,797,935,953 and 2,797,935,953 issued and outstanding at December 31, 2021 and 2020, respectively | 279,794 | 279,794 |
| Additional paid-in-capital | 25,497,211 | 22,697,485 |
| Preferred stock subscribed | 190 | 176 |
| Common stock subscribed | 12,809 | 12,809 |
| Additional paid-in-capital subscribed | 2,071,843 | 1,122,033 |
| Accumulated Deficit | (30,202,722) | (29,533,234) |
| **Total shareholders' equity/(deficit)** | (2,289,813) | (5,370,325) |
| **Total liabilities and shareholders' deficit** | $ 3,238,251 | $ 568,412 |

*See accompanying notes to condensed consolidated financial statements.*

**48**

# ENZOLYTICS, INC.
## CONSOLIDATED
## STATEMENTS OF OPERATIONS
### (Audited)

|  | | For the Year Ended December 31, 2021 | | For the Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Continuing Operations:** | | | | |
| License Revenues | $ | 200,000 | $ | - |
| | | | | |
| **Expenses:** | | | | |
| General and administrative | $ | 264,477 | $ | 1,465,515 |
| Salaries, wages and related costs | | 560,011 | | 233,497 |
| Consulting | | 332,072 | | 1,018,968 |
| Research and development expenses | | 116,753 | | 501,806 |
| Professional fees | | 317,061 | | 66,639 |
| Depreciation | | 20,442 | | 16,964 |
| **Total expenses** | | 1,610,817 | | 3,303,389 |
| | | | | |
| **Loss from operations** | | (1,410,817) | | (3,303,389) |
| | | | | |
| **Other income (expense):** | | | | |
| Interest income | | 91 | | - |
| Forgiveness of accrued liabilities | | 778,567 | | - |
| Interest expense | | (37,330) | | (177,302) |
| **Total other income (expense)** | | 741,329 | | (177,302) |
| **Net income/(loss)** | $ | (669,488) | $ | (3,480,691) |
| **Basic and diluted loss per common share** | $ | (0.00) | $ | (0.00) |
| **Weighted average shares outstanding – Basic and Diluted** | | 2,797,935,953 | | 1,592,750,400 |

*See accompanying notes to condensed consolidated financial statements.*

49

**ENZOLYTICS, INC. AND SUBSIDIARIES**
**Statements of Cash Flows**
**(Audited)**

| | | For the Year Ended December 31, 2021 | | For the Year Ended December 31, 2020 |
|---|---|---|---|---|
| **Cash flows from operating activities** | | | | |
| Net loss | $ | (669,488) | $ | (3,480,691) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | | |
| Non-cash expenses: | | | | |
| Depreciation | | 20,442 | | 16,964 |
| Amortization | | - | | 57,500 |
| Stock based compensation | | - | | 2,135,856 |
| Obligations relating to assuming Crowdfunding, Convertible notes on November 30, 2020 | | - | | 654,606 |
| Notes payable issued to investors for services | | - | | 30,000 |
| Changes in operating assets and liabilities: | | | | |
| (Increase) decrease in deposits | | (2,595) | | (2,960) |
| Increase (decrease) in accounts payable | | 31,439 | | (31,875) |
| Increase (decrease) in accrued expenses and other current liabilities | | (686,186) | | 129,586 |
| **Net cash provided by operating activities** | | (1,306,389) | | (491,014) |
| | | | | |
| **Cash flows from investing activities** | | | | |
| Purchases of property and equipment | | (165,927) | | - |
| **Net cash used by investing activities** | | (165,927) | | - |
| | | | | |
| **Cash flows from financing activities** | | | | |
| Payments to convertible notes | | (6,026) | | - |
| Payments to related parties - Directors and stockholders | | - | | (50,774) |
| Proceeds received from related parties - Directors and stockholders | | 100 | | 17,036 |
| Proceeds received from the issuances of notes payable to investors | | 250,000 | | 273,000 |
| Proceeds received from sale of Series C Preferred Stock subscribed | | 950,000 | | 805,000 |
| Proceeds received from sale of Series E | | 2,000,000 | | - |
| Proceeds from sale of common stock | | - | | 5,050 |
| **Net cash provided by financing activities** | | 3,194,074 | | 1,049,312 |
| | | | | |
| Increase in cash | | 1,721,759 | | 558,298 |
| Cash at beginning of period | | 560,389 | | 2,091 |
| Cash at end of period | $ | 2,282,148 | $ | 560,389 |
| | | | | |
| **Supplemental Cash Flow Information:** | | | | |
| Cash paid for interest | $ | - | $ | - |
| Cash paid for income taxes | $ | - | $ | - |
| **Non-cash investing and financing activities** | | | | |
| Common stock issued for settlement agreement | $ | - | $ | 317,973 |
| Beneficial conversion feature relating to issuance of notes payable to investors | $ | - | $ | 30,000 |
| Conversion of notes and accrued interest into shares of Series C Preferred Stock | $ | - | $ | 547,201 |
| Conversion of notes and accrued interest into shares of common stock | $ | - | $ | 187,423 |
| Series B Preferred Stock for acquisition of subsidiary | $ | 800,000 | $ | - |

*See accompanying notes to condensed consolidated financial statements.*

50

**Examplytics, Inc. and Subsidiaries**
**Statement of Stockholder's Equity (Deficit)**
**For the Period from December 31, 2019 to December 31, 2021**
**(Audited)**

| | Preferred Stock Series A Shares | Preferred Stock Series A Amount | Preferred Stock Series B Shares | Preferred Stock Series B Amount | Preferred Stock Series C Shares | Preferred Stock Series C Amount | Beneficial Conversion Feature Preferred Stock Series | Preferred Stock Series E Shares | Preferred Stock Series E Amount | Common Stock Shares | Common Stock to be Issued | Common Stock Amount | Additional Paid-in Capital | Preferred Stock Subscribed | Common Stock Subscribed | Additional Paid-in Capital Subscribed | Earnings (Deficit) Accumulated | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, December 31, 2019 | 69,806,000 | $ 6,000 | 20,000,000 | $ 2,000 | - | $ - | - | - | $ - | 1,866,020,359 | $ 317,977,000 | $ 186,602 | $ 26,064,777 | - | $ 12,809 | $ 269,147 | $ (26,052,543) | $ (5,608,... ) |
| Proceeds received for private placement | | | | | | | | | | 25,000,000 | | 2,500 | 2,550 | | | | | |
| Common stock issued for settlement agreem... | | | | | | | | | | 313,973,000 | (313,973,000) | 31,397 | (31,397) | | | | | - |
| Stock issued in exchange of notes payables f... | | | | | | | | | | 1,064,941,894 | | 106,494 | 82,028 | | | | | |
| Series C preferred stock issued in connectio... | | | | | 941,078 | 94 | | | | | | | 940,890 | | | | | |
| Deemed dividend relating to the beneficial c... | | | | | | | (470,445) | | | | | | (470,445) | | | | | - |
| Deemed dividend relating to the beneficial c... | | | | | | | 470,445 | | | | | | | | | | | |
| Stock based compensation expenses | | | | | | | | | | 120,050,000 | | 12,000 | 2,084,388 | | | | | 2,156,... |
| Stock issued in 2020 for services performed | | | 50,000,000 | 5,000 | | | | | | | | | (5,000) | | | | | - |
| Series B preferred stock converted to comm... | | | (20,000,000) | (2,000) | | | | | | 200,000,000 | | 20,000 | (18,000) | | | | | - |
| Beneficial conversion feature relating to bla... | | | | | | | | | | | | | 30,060 | | | | | 30,060 |
| Stock issued for exchange of shares of subsi... | | | | | | | | | | 4,000,000 | | 400 | 19,920 | | | | | |
| Series C preferred stock subscription agreem... | | | | | | | (881,662) | | | | | | 881,662 | 176 | | 881,486 | | |
| Deemed dividend relating to the beneficial c... | | | | | | | 881,662 | | | | | | (881,662) | | | (18,600) | | |
| Net loss, December 31, 2020 | | | | | | | | | | | | | | | | | (3,480,697) | (3,480,697) |
| Balance, December 31, 2020 | 69,806,000 | $ 6,000 | 445,180,000 | $ 44,518 | 941,078 | $ 94 | - | - | $ - | 2,797,935,253 | $ - | $ 279,794 | $ 22,697,485 | 176 | $ 12,809 | $ 1,122,803 | $ (29,533,234) | $ (5,370,...) |
| Proceeds received for private placement | | | | | | | | 2,500,000 | 250 | | | | 1,099,750 | | | | | 2,000,000 |
| Stock subscribed | | | | | | | | | | | | | | 190 | | 949,810 | | 950,000 |
| Stock issued for investment in IMPL | | | 2,000,000 | 200 | | | | | | | | | 799,800 | | | | | 800,000 |
| Stock subscribed adjustment | | | | | | | | | | | | 176 | | (176) | | | | - |
| Net loss, December 31, 2021 | | | | | | | | | | | | | | | | | (669,486) | (669,486) |
| Balance, December 31, 2021 | 69,806,000 | $ 6,000 | 447,180,000 | $ 44,718 | 941,078 | $ 94 | - | 2,500,000 | $ 250 | 2,797,935,253 | $ - | $ 279,794 | $ 25,497,211 | 190 | $ 12,809 | $ 2,071,843 | $ (30,202,721) | $ (2,289,...) |

*See accompanying notes to condensed consolidated financial statements*

FS-4 of 22

51

# ENZOLYTICS, INC.
## and Subsidiaries
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## YEARS ENDED DECEMBER 31, 2021 and 2020

### Note 1. Organization and Business Description

Enzolytics, Inc. ("Enzolytics" or the "Company") is a Delaware corporation originally formed in the United Kingdom on July 28, 2004. On November 25, 2004, the Company changed its name to Falcon Media Services, Ltd. On November 12, 2008, the Company changed its name to Extreme Mobile Coatings Corp., Ltd.  On March 2, 2009 re-domiciled in Delaware and at the same time the Company changed its name to Extreme Mobile Coatings Worldwide Corp. On May 19, 2010, the Company changed its name to Structural Enhancement Technologies Corp. ("Structural"). On November 16, 2012, the Company changed its name to Eco-Petroleum Solutions, Inc. ("Eco-Petroleum"). On September 11, 2017, the Company changed its name to Immunotech Laboratories, Inc.  On March 22, 2018, the Company changed its name to Enzolytics, Inc. ("Enzolytics").  On May 21, 2020, the Company began the process of re-domiciling in Wyoming but on November 4, 2020 the Company decided to remain a Delaware Corporation and filed all the requisite documents to bring it current.

Enzolytics is a biotechnology company, whose products consist of multiple distinct drug development proprietary technologies: Immunotherapy, immune modulators, fully human monoclonal antibodies and an artificial intelligence (AI) platform for health care developments. The Company has clinically tested anti-HIV therapeutics. Additionally, the Company has created a proprietary cell line that produces fully human monoclonal antibodies that target and neutralizes the HIV virus.

### Merger Agreement

On November 16, 2020, the Company (having been renamed, immediately prior to this Holding Company Reorganization, from "Enzolytics, Inc." to "ENZC SUB, Inc.") completed a corporate reorganization (the "Holding Company Reorganization") pursuant to which ENZC SUB, Inc., (the "Predecessor") became a direct, wholly-owned subsidiary of a newly formed Delaware corporation, Enzolytics, Inc. (the "Holding Company"), which became the successor issuer. In other words, the Holding Company is now the public entity. The Holding Company Reorganization was effected by a merger conducted pursuant to Section 251(g) of the Delaware General Corporation Law (the "DGCL"), which provides for the formation of a holding company without a vote of the stockholders of the constituent corporations.

In accordance with Section 251(g) of the DGCL, Enzolytics Merger Corp. ("Merger Sub"), another newly formed Delaware corporation and, prior to the Holding Company Reorganization, was an indirect, wholly owned subsidiary of the Predecessor, merged with and into the Predecessor, with the Predecessor surviving the merger as a direct, wholly owned subsidiary of the Holding Company (the "Merger"). The Merger was completed pursuant to the terms of an Agreement and Plan of Merger among the Predecessor, the Holding Company and Merger Sub, dated November 16, 2020 (the "Merger Agreement").

On November 30, 2020, the Company consummated the Merger Agreement which involved the formation of two wholly-owned operating subsidiaries, Biogenysis, Inc., ("Biogenysis") and Virogentics, Inc., ("Virogentics"). Biogenysis was formed to acquire the intellectual property rights of and license owned by certain officers of BioClonetics Immunotherapeutics, Inc., ("BioClonetics") and Virogentics which was formed to acquire the intellectual property rights of and licensed owned by a controlling stockholder of Enzolytics.  Both of the newly formed subsidiaries are Texas Corporations.

In connection with the Holding Company Reorganization, all outstanding shares of common stock and preferred stock of the Predecessor were automatically converted into identical shares of common stock or preferred stock, as applicable, of the Holding Company on a one-for-one basis, and the Predecessor's existing stockholders and other holders of equity instruments, became stockholders and holders of equity instruments, as applicable, of the Holding Company in the same amounts and percentages as they were in the Predecessor prior to the Holding Company Reorganization.

The Holding Company adopted a certificate of incorporation (the "Certificate") and bylaws (the "Bylaws") that are, in all material respects, identical to the certificate of incorporation and bylaws of the Predecessor immediately prior to the Holding Company Reorganization, with the possible exception of certain amendments that are permissible under Section 251(g)(4) of the DGCL.

52

As part of the business combination of Bioclonetics, Inc. and Enzolytics, Inc., the controlling shareholder of Enzolytics agreed to transfer 35,100,000 shares of its Series A Preferred Stock and 231,000,000 shares of its common stock, which

## ENZOLYTICS, INC.
### and Subsidiaries
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### YEARS ENDED DECEMBER 31, 2021 and 2020

represented Enzolytics control block, to three individuals of BioClonetics, who became officers of the Company. As a result, the three individuals obtained a majority voting interest in Enzolytics, resulting in change in the majority ownership control in Enzolytics. The business combination was accounted for as a business combination pursuant to Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 805, *Business Combinations*. The Company has elected not to apply pushdown accounting for the change in control. As a result, Enzolytics capital structure will continue to be reported as it was prior to November 30, 2020.

Following the business combination, the Company issued 204,430,000 shares of its Series B Convertible Preferred Stock to officers of BioClonetics who owned the intellectual property rights to the U.S. Provisional Patent Application No. 63/078,482, filed September 15, 2020, relating to NOVEL HIV- BINDING PEPTIDES for treating, preventing and reducing the risks of HIV, including all patents issuing therefrom and any foreign counterparts thereof.

In addition, the Company issued 90,750,000 shares of its Series B Convertible Preferred Stock to the controlling stockholder of Enzolytics who owned the intellectual property rights to U.S. Patent No. 7,479538, entitled Irreversibly- Inactivated pepsinogen fragment and Pharmaceutical composition the same for detecting preventing and treating HIV and U.S. Patent No. 8,066982, Irreversibly - Inactivated pepsinogen fragment and Pharmaceutical composition compressing the same for detecting preventing and treating HIV, including all patents issuing therefrom and any foreign counterparts thereof.

### Note 2. Basis of Presentation

#### *Principles of Consolidation*

The accompanying consolidated financial statements of Enzolytics and its subsidiaries and have been prepared in accordance with accounting principles generally accepted in the U.S. ("U.S. GAAP"). All intercompany transactions and account balances have been eliminated in consolidation.

#### *Liquidity*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. The Company has incurred operating loss since inception and as of December 31, 2021, the Company has incurred accumulated deficit of $30,202,722. The Company has funded its operations through the issuances of notes payable to investors and sales of Series C Convertible Preferred Stock.

The Company evaluated whether there are any conditions and events, considered in the aggregate, that raise substantial doubt about its ability to continue as a going concern within one year beyond the filing of this Annual Report. In 2021, the Company has raised $2,000,000 in sales of Series E Convertible Preferred Stock and additional $950,000 in sales of subscribed Series C Convertible Preferred Stock. On May 12, 2021, the Company entered into a distribution agreement with an entity to distribute the Company's anti-HIV-1 therapeutic ITV-1 in the countries of India, Pakistan, UAE, Indonesia, Philippines, Nigeria, Benin and Togo, Kenya, Tanzania, Rwanda, Libya, Uganda, North Sudan, Egypt, Morocco, and Tunisia. The Company received $1,000,000 in cash from the distribution agreement.

### Note 3. Summary of Significant Accounting Policies

#### *Use of estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and the reported amounts of revenues and expenses at the date of the consolidated financial statements and during the reporting periods, and to disclose contingent assets and liabilities at the date of the consolidated financial statements. Actual results could differ from those estimates. The most significant estimates relate to the fair value of securities underlying stock-based compensation expense and other equity awards.

**53**

#### *Significant risks and uncertainties*

The Company's operations are subject to a number of factors that may affect its operating results and financial condition. Such factors include, but are not limited to: the clinical and regulatory development of its products, the

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

Company's ability to preserve its cash resources, the Company's ability to add product candidates to its pipeline, the Company's intellectual property, competition from products manufactured and sold or being developed by other companies, the price of, and demand for, Company products if approved for sale, the Company's ability to negotiate favorable licensing or other manufacturing and marketing agreements for its products, and the Company's ability to raise capital.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less at the date of purchase to be cash equivalents.

Financial instruments that potentially subject the Company to concentration of credit risk consist principally of cash deposits. Accounts at each institution are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000. At December 31, 2022 and 2021, the Company had $2,032,148 and $310,389 in excess of the FDIC insured limit.

*Property and Equipment*

Property and equipment are recorded at cost and depreciated using the straight-line method over the estimated useful lives of the assets. Repairs and maintenance costs are charged to expense as incurred.

The estimated useful lives for property and equipment are as follows:

| | |
|---|---|
| Machinery and equipment | 5-10 years |

For the years ended December 31, 2021 and 2020, depreciation expense was $20,442 and $16,964, respectively.

*Impairment of Long-Lived Assets*

The Company regularly reviews the carrying value and estimated lives of its long-lived assets, to determine whether indicators of impairment may exist which warrant adjustments to carrying values or estimated useful lives. Should an impairment exist, the impairment loss would be measured based on the excess over the carrying amount of the asset's fair value. For the years ended December 31, 2021 and 2020, the Company has not recognized any impairment losses.

*Fair Value of Financial Instruments*

The Company has no financial assets or liabilities that are measured at fair value on a recurring basis. FASB ASC Topic 820, *Fair Value Measurement Disclosure,* prioritizes inputs used in measuring fair value into a hierarchy of three levels: Level 1- unadjusted quoted prices for identical assets or liabilities traded in active markets; Level 2- inputs other than quoted prices included within Level 1 that are either directly or indirectly observable; and Level 3- unobservable inputs in which little or no market activity exists, therefore requiring an entity to develop its own assumptions that market participants would use in pricing. The carrying amounts of the Company's financial instruments, including cash, accounts payable, notes payable to investors and the Crowdfunding convertible notes approximate their fair values due to the short-term nature of these items.

*Stock-Based Compensation*

The Company accounts for its stock-based compensation expense in accordance with ASC Topic 718, *Compensation—Stock Compensation* ("ASC 718"). ASC 718 requires all stock-based payments to employees, directors and non-employees to be recognized as expense based on their grant date fair values. For equity-based payment awards, the Company recognizes compensation expense over the service period using the straight-line method.

On January 1, 2019, the Company adopted ASU No. 2018-07, *Improvements to Non-employee Share-Based Payment Accounting*, which expands the scope of ASC 718, Compensation—Stock Compensation to include share-based payments issued to non-employees for goods or services. Consequently, the accounting for share-based payments to non-employees and employees are substantially aligned.

54

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

*Research and Development Costs*

Research and development expenses primarily consist of costs associated with the preclinical and clinical development of the Company's product candidates. Research and development costs are expensed as incurred.

*Convertible Instruments*

The Company evaluates and accounts for conversion options embedded in its convertible instruments as follows:

Stock-settled debt under ASC Topic 480, *Distinguishing Liabilities From Equity* ("ASC 480"). The Company has issued certain convertible notes to investors which provides these investors to convert the notes into a variable number of shares with an aggregate fair value equal to the notes outstanding principal balance.

All other convertible instruments, the Company evaluates embedded conversion features within convertible debt under ASC Topic 815, *Derivatives and Hedging* ("ASC 815") to determine whether the embedded conversion feature(s) should be bifurcated from the host instrument and accounted for as a derivative at fair value with changes in fair value recorded in earnings. If the conversion feature does not require derivative treatment under ASC 815, the instrument is evaluated under ASC 470-20, *Debt with Conversion and Other Options* ("ASC 470-20"). As of December 31, 2021 and 2020, there were no conversion features that met the definition of a derivative.

Under the ASC 470-20, an entity must separately account for the liability and equity components of the convertible debt instruments that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for convertible debt instruments is that the equity component is required to be included in the additional paid-in capital in the consolidated balance sheets and the value of the equity component is treated as a debt discount which is then amortized over the term of the related debt to its earliest date of redemption.

The Company also records deemed dividends for the intrinsic value of conversion options embedded in its Series C Convertible Preferred Stock issuances based on the fair values of the Series C Convertible Preferred Stock and warrants and the differences between the Company's common stock price at the date of the transaction for the effective conversion price.

*Warrants*

The Company evaluates and accounts for warrants granted pursuant to ASC 480 and ASC 815 to determine whether the warrants are classified as a liability or equity.

*Income Taxes*

The Company account for income taxes pursuant to ASC Topic 740, *Income Taxes*. Under ASC Topic 740, deferred tax assets and liabilities are determined based on temporary differences between the bases of certain assets and liabilities for income tax and financial reporting purposes. The deferred tax assets and liabilities are classified according to the financial statement classification of the assets and liabilities generating the differences.

*Loss per Common Share*

Basic and diluted net loss per share is presented in conformity with ASC Topic 260, *Earnings per Share*, ("ASC 260") for all periods presented. In accordance with this guidance, basic and diluted net loss per common share was determined by dividing net loss applicable to common stockholders by the weighted-average common shares outstanding during the period.

*Recent Accounting Pronouncements*

In May 2021, the FASB issued ASU No. 2021-04 ("ASU 2021-04), *Earnings Per Share* (Topic 260), *Debt—Modifications and Extinguishments* (Subtopic 470-50), *Compensation—Stock Compensation* (Topic 718), and *Derivatives and Hedging—Contracts in Entity's Own Equity* (Subtopic 815-40): Issuer's Accounting for Certain Modifications or Exchanges of Freestanding Equity-Classified Written Call Options (a consensus of the FASB Emerging Issues Task Force). The amendments in this update are effective for all entities for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. The Company is currently evaluating the impact of this new standard.

55

# ENZOLYTICS, INC.
## and Subsidiaries
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## YEARS ENDED DECEMBER 31, 2021 and 2020

In August 2020, the FASB issued ASU No. 2020-06, *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"), which simplifies the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts in an entity's own equity. The standard eliminates the liability and equity separation model for convertible instruments with a cash conversion feature. As a result, after adoption, entities will no longer separately present in equity an embedded conversion feature for such debt. Additionally, the embedded conversion feature will no longer be amortized into income as interest expense over the instrument's life. Instead, entities will account for a convertible debt instrument wholly as debt unless (1) a convertible instrument contains features that require bifurcation as a derivative under ASC Topic 815, Derivatives and Hedging, or (2) a convertible debt instrument was issued at a substantial premium. Additionally, the standard requires applying the if-converted method to calculate convertible instruments' impact on diluted earnings per share ("EPS"). The standard is effective for fiscal years beginning after December 15, 2021, with early adoption permitted for fiscal years beginning after December 15, 2020. The Company is currently evaluating the impact of this new standard.

**Note 4. Notes payable to investors**

As of December 31, 2021 and 2020, the balance of the notes payable to investors were as follows

### As of December 31,

| | 2021 | | 2020 |
|---|---|---|---|
| Convertible promissory notes, due on April 28, 2010, interest at 8.0% per annum, unsecured | $ 140,000 | $ | 140,000 |
| Convertible promissory notes, due on December 24, 2013, interest at 10.0% per annum, unsecured | 50,000 | | 50,000 |
| Convertible promissory notes, due on January 16, 2014, interest at 10.0% per annum, unsecured | 100,000 | | 100,000 |
| Convertible promissory notes, due on October 31, 2012, interest at 10.0% per annum, unsecured | 15,000 | | 15,000 |
| Promissory note, no interest, unsecured | 59,800 | | 59,800 |
| Convertible promissory notes, due on March 9, 2018, interest at 12.0% per annum, unsecured | 25,000 | | 25,000 |
| Convertible promissory notes, due on June 23, 2018, interest at 12.0% per annum, unsecured | 5,000 | | 5,000 |
| Convertible promissory notes, due on September 14, 2018, interest at 12.0% per annum, unsecured | 10,000 | | 10,000 |
| Convertible promissory notes, due on April 13, 2019, interest at 12.0% per annum, unsecured | 12,500 | | 12,500 |
| Notes payable | 125,000 | | |
| Notes payable | 125,000 | | - |
| Less:  Short Term payables, net of discount | $ 667,300 | $ | 417,300 |

The following is a description of the notes payable to investors:

Short-term notes payable as of December 31, 2021 and 2020, consisted, in part, of two separate notes given to the same holder, one for $100,000, dated November 3, 2009, and the other for $50,000, dated January 11, 2010. Both notes had six-month terms and accrued interest at 8% per annum. As of December 31, 2021, and December 31, 2020, both notes were in default and, as such, the holder has the right to convert the amounts to shares of restricted common stock at a 25% discount to the thirty-day average closing price prior to the date of conversion. Subsequent

**56**

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

to December 31, 2010, the holder agreed not to convert the debt to shares and to settle these obligations for $150,000, plus accrued interest, in connection with the completion of a merger transaction with Landmark Consulting, Inc. The transaction with Landmark was not completed by the Company. Subsequently, on February 14, 2012, the Company issued 50,000 shares of registered common stock to the holder (post reverse stock split) in satisfaction of $50,000 in principal on the notes. The balance remaining is $140,000.00 and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On April 13, 2012, the Company issued a promissory note, due October 31, 2012, to a stockholder for $15,000. The note carries an interest rate of 10% per annum, and may be either repaid, at the election of the note holder in cash plus the issuance of shares of common stock of the Company in the amount of $30,000 in value, or by the conversion of the principal and interest due into a total of $45,000 in value of common stock of the Company, along with additional warrants to purchase common stock of the Company with an additional value of $10,000, with such warrants being exercisable within one year from the date of issuance, and shall have an exercise price equal to 50% of the average closing price of the common stock of the Company on the five trading days prior to exercise. As of December 31, 2021, and December 31, 2020, the promissory note was in default. The promissory note is guaranteed by shares of common stock of the Company owned by James W. Zimbler, a Director and stockholder of the Company and was subject to the 251g reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On September 25, 2013, the Company issued an $50,000 10% unsecured convertible note to an investor due December 24, 2013. Under the terms of the note agreement, the note may be repaid with appropriate interest to the investor by the Company on the earlier of the due date or the date the Company raises in excess of $500,000 from its current capital formation activities, or all or a portion of the principal and accrued and unpaid interest may be converted, at the election of the investor into shares of common stock of the Company at a price equal to 85% of the market price (meaning the average of the lowest two trading prices for the five-day trading period before the date of conversion) of the Company's common stock. As of December 31, 2021, and December 31, 2020, the promissory note was in default, and the Company obtained a written waiver from the investor dated March 26, 2014, and a subsequent verbal waiver, confirming that all terms and conditions contained in the promissory note would remain in effect as the Company was continuing with its capital formation activities. Further, on February 11, 2014, the Company issued 100,000 shares of common stock to the note holder, with a value of $5,000, as an incentive to continue working with the Company on its capital formation and other merger activities and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On October 18, 2013, the Company issued a $100,000 10% unsecured convertible note due January 16, 2014 to the same investor as the September 25, 2013 note. Under the terms of the note agreement, the note may be repaid with appropriate interest to the investor by the Company on the earlier of the due date or the date the Company raises in excess of $750,000 from its current capital formation activities, or all or a portion of the principal and accrued and unpaid interest may be converted, at the election of the investor into shares of common stock of the Company at a price equal to 85% of the market price (meaning the average of the lowest two trading prices for the five day trading period before the date of conversion) of the Company's common stock. As of December 31, 2021, and December 31, 2020, the promissory note was in default, and the Company obtained a written waiver from the investor dated March 26, 2014, and a subsequent verbal waiver, confirming that all terms and conditions contained in the promissory note would remain in effect as the Company was continuing with its capital formation and other merger activities. This loan was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

A debt purchase agreement was entered in on January 29, 2015. On February 10, 2015, the Company issued a total of 10,000,000 shares to Mr. Mergenthaler in settlement of $190,000 of the amount due him, reducing the total amount owed of the note payable from $283,500 to the amount of $71,500. On December 31, 2021 and 2020, the balance was $59,800 and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. On February 27, 2017, the Company issued an $10,800 12% unsecured convertible note to an investor due March 27, 2018. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of common stock of the Company at a 50% discount based on Company's lowest closing bid stock price during the past 10 days up to the conversion notice. The investor's right to convert the note is triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration

57

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On March 9, 2017, the Company issued an $25,000 12% unsecured convertible to an investor due March 9, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the note investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. Note was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On May 23, 2017, the Company issued an $6,500 12% unsecured convertible note to an investor due May 22, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On May 26, 2017, the Company issued an $5,000 12% unsecured convertible note to an investor due June 23, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. The note was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On June 20, 2017, the Company issued an $3,000 12% unsecured convertible note to an investor due June 19, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On September 14, 2017, the Company issued an $25,000 12% unsecured convertible note to an investor due September 14, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On March 22, 2019, $5,000 was converted to stock. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, the remaining balance of this note was converted into shares of its Series C Convertible Preferred stock.

On November 16, 2017, the Company issued an $22,800 12% unsecured convertible note to an investor due December 27, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the

58

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On March 14, 2017, the Company issued an $23,900 12% unsecured convertible note to an investor due March 14, 2018. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at a 50% discount based on Company's lowest closing bid stock price during the past 10 days up to the conversion date. The investor's right to convert the note is triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On September 14, 2017, the Company issued an $10,000 12% unsecured convertible note to an investor due September 14, 2018, for $10,000 in proceeds. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. The note was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On April 13, 2018, the Company issued an $12,500 12% unsecured convertible note to an investor due April 13, 2019. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor and was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On April 19, 2018, the Company issued an $4,000 12% unsecured convertible note to an investor due April 19, 2019. Under the terms of the note agreement, the note may be either repaid, at the election of the note investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock. On April 26, 2018, the Company issued an $5,850 12% unsecured convertible not to an investor due April 26, 2019. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On June 15, 2018, the Company an $2,275 12% convertible note to an investor due June 15, 2019. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On October 3, 2018, the Company issued an $5,000 unsecured convertible note to an investor due October 3, 2019. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of

**59**

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On November 5, 2018, the Company issued an $3,000 12% unsecured convertible note to an investor due November 5, 2019. Under the terms of the note agreement, the note can either be repaid at the election of the note holder in cash or converted into shares of the Company's common stock at a 50% discount based on Company's lowest closing bid stock price during the past 10 days up to the conversion date. The investor's right to convert the note is triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

Beginning on January 2, 2019 and through the end of December 31, 2019, the Company issued monthly $5,000 12% unsecured convertible notes to an investor for a total of $60,000 for services relating to a consulting agreement entered into on January 3, 2019. Each of the monthly $5,000 notes have a maturity date of one year from the monthly issuance dates. Under the terms of the note agreement, the investor in its sole discretion may elect to convert the note or an portion of the note into shares of the Company's common stock at a conversion price equal to $0.0001 per share. The investors right to convert the note will be triggered upon the occurrence of any one of the following: (i) 6 months from the date of said note, (ii) change in control the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. In 2019, as a result of the fixed conversion price of $0.0001 per share, the Company recognized a beneficial conversion of $60,000 for the differences between the fixed conversion price and the fair value of the Company's common stock on the date of each of the monthly issuances. The beneficial conversion was recorded as debt discount on the consolidated balance sheet as a direct deduction from the face amounts of the notes and a corresponding increase to additional paid in capital. The debt discount is being amortized using the straight-line method through the maturity dates. For the year ended December 31, 2019, the Company recorded $32,500 of amortization expense which was recorded as interest expense in its consolidated statements of operations. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

From January 1, 2020 and continuing through June 1, 2020, the Company issued monthly $5,000 12% unsecured convertible notes to an investor for a total of $30,000 for services relating to a consulting agreement entered into on January 3, 2019. Each of the monthly $5,000 notes have a maturity date of one year from the monthly issuance dates. Under the terms of the note agreements, the investor in its sole discretion may elect to convert the note or a portion of the note into shares of the Company's common stock at a conversion price equal to $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of any one of the following: (i) 6 months from the date of said note, (ii) change in control the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. In 2020, as a result of the fixed conversion price of $0.0001 per share, the Company recognized a beneficial conversion of $30,000 for the differences between the fixed conversion price and the fair value of the Company's common stock on the date of each of the monthly issuances. The beneficial conversion was recorded as debt discount on the consolidated balance sheet as a direct deduction from the face amounts of the notes and a corresponding increase to additional paid in capital. The debt discount is being amortized using the straight-line method through the maturity dates. On October 19, 2020, the Company and the investor amended the terms for each of the monthly $5,000 12% unsecured convertible notes which in aggregate totaled $90,000. Under the amended terms, the notes are now secured by the Company's common stock. In addition the conversion terms were amended as follows: the investor may convert each of the notes, or portion thereof, into shares of the Company's common stock at a conversion price equal to the lower of: (i) 50% of the lowest closing bid price of the Company's common stock for the 30 trading days preceding the conversion notice or (ii) $0.0001 per share. The investor's right to convert each of the notes will be triggered upon the occurrence of any one of the following: (i) 6 months from the date of said note, (ii) change in control the Company, (iii) the filing of a registration statement or offering, or (iv) election by investor. On October 19, 2020, the Company recorded $57,500 of amortization expense which was recorded as interest expense in its consolidated statements of operations. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, the notes were converted into shares of its Series C Convertible Preferred stock.

**60**

On April 15, 2020, the Company issued an $10,000 12% unsecured convertible note to an investor due April 15, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On April 30, 2020, the Company issued an $8,000 12% unsecured convertible note to an investor due April 30, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On July 21, 2020, the Company issued an $25,000 10% unsecured convertible note to an investor due July 21, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at a 50% discount based on Company's lowest closing bid stock price during the past 10 days up to the conversion date. In connection with the Series C Convertible Preferred stock subscription agreement in December 2020, this note was converted into shares of its Series C Convertible Preferred stock.

On September 30, 2020, the Company issued an $5,000 12% unsecured convertible note to an investor due September 30, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On October 9, 2020, the Company issued an $25,000 12% unsecured convertible note to an investor due October 9, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On October 13, 2020, the Company issued an $25,000 12% unsecured convertible note to an investor due October 13, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On October 26, 2020, the Company issued two $100,000 12% unsecured convertible notes to investors due October 26, 2021. Under the terms of the note agreements, the notes can either be repaid at the election of the investors in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investors right to convert the notes will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, the notes were converted into shares of its Series C Convertible Preferred stock.

**61**

## ENZOLYTICS, INC.
### and Subsidiaries
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### YEARS ENDED DECEMBER 31, 2021 and 2020

On December 19, 2020, the Company issued an $2,500 12% unsecured convertible note to an investor due December 19, 2021. Under the terms of the note agreement, the note can either be repaid at the election of the investor in cash or converted into shares of the Company's common stock at the lower of (i) 50% of the lowest closing bid price for the 30 trading days immediately prior to a conversion date or (ii) at $0.0001 per share. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. On November 16, 2020, in connection with the Company entering into a Securities Exchange Agreement, this note was converted into shares of its Series C Convertible Preferred stock.

On November 12, 2021 and November 15, 2021, respectively, two investors loaned $125,000 each to fund Robustomed, Inc.

### Note 5. Crowdfunding convertible notes

On November 30, 2020, the Company assumed the responsibilities of the Crowdfunding convertible notes issued by BioClonetics to various investors as part of its business combination agreement. On November 30, 2020, the outstanding balance of the Crowdfunding convertible notes was $654,606 consisting various investor notes ("Investor Notes" or "Investor Note"). As a result, the Company recorded an expense of $654,606 to general and administrative expenses in its consolidated statements of operations for the year ended December 31, 2020, and corresponding amount to Crowdfunding convertible notes on its consolidated balance sheet for the Company's servicing responsibilities for these notes. The Crowdfunding convertible notes are stock-settled debt under ASC 480.

The Crowdfunding convertible notes consisted of the following: (1) the Convertible Crowdfunding Notes Financing Arrangement (the "Convertible Financing Arrangement") and (2) the Simple Agreement for Future Equity Financing arrangement (the "SAFE Financing Arrangement").

***Company's obligations to the investors of both the Convertible Financing Arrangement and SAFE Financing Arrangement of BioClonetics***

Since the underlying obligation to the investors is a BioClonetic obligation as it relates to a sale of the company and capital raises at the Company believes that neither of these scenario's will never happen, the Company offered the following three options to the investors to settle the Crowdfunding convertible notes:

Option 1: The investor may elect to hold its note until a conversion event occurs such as a future Series A financing round or when the Company is acquired.

Option 2: The investor may elect to have the Company repay the notes along with the 2% interest.

Option 3: The investor may elect to exchange its notes for each $5.00 note investment into 1 shares of Series D Preferred Stock.

### Note 6. Related Party Transactions

As of December 31, 2021 and 2020, the Company owed to Directors, officers, and stockholders of the Company $343,101 and $343,101, respectively. The amounts are unsecured, noninterest bearing, and have no terms for repayment. The individual amounts owed to Directors, officers and stockholders are presented as follows:

As of December 31,

|  | | 2021 | | 2020 |
|---|---|---|---|---|
| James W. Zimber | $ | 142,646 | $ | 142,646 |
| Harry Zhabilov | | 200,455 | | 200,455 |
|  | $ | 343,101 | $ | 343,101 |

On May 20, 2010, a Director and former officer of the Company loaned $35,000 and received a promissory note from the Company with an annual interest rate of 8%. The note has a term of six months, at which time, the principal and accrued interest are due and payable. The note can be prepaid at any time and from time to time at par and accrued interest. The principal and interest of the note are also convertible to 20,000 shares of the Company's common stock (post reverse stock split) at the end of the six-month term at the designation of the holder. As of December 31, 2021

62

# ENZOLYTICS, INC.
## and Subsidiaries
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
## YEARS ENDED DECEMBER 31, 2021 and 2020

and December 31, 2020, the promissory note was in default, and the amount of $35,000 of principal on the note was due and payable to the note holder plus accrued interest of $32,507, and $29,707, respectively. Interest expense related to this loan was $2,800 and $2,800 for the twelve months ended December 31, 2021 and 2020, respectively. The balance remaining is $35,000. and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity Enzolytics Merger Corp. ("Merger Sub"), Robustomed, Inc.

## Note 7. Discontinued Operations

Effective September 30, 2014, the Board of Directors of the Company resolved to discontinue the operations of EMC, its wholly owned subsidiary. As such, the assets and accumulated depreciation of EMC's property and equipment were removed from the accounts, and all remaining liabilities were classified as discontinued operations in the accompanying balance sheets. As of December 31, 2021 and 2020 the summaries of liabilities pertaining to discontinued operations were as follows:

|  | December 31, | |
|---|---|---|
|  | **2021** | **2020** |
| Bank loan, monthly payments of $2,736 through 2015, interest at 8.5% per annum, secured | $ 33,359 | $ 33,359 |
| Accounts payable - Trade | 6,000 | 6,000 |
| Accrued liabilities | 36,800 | 36,800 |
| Payroll and sales taxes payable | 8,200 | 8,200 |
| Due to related party - Stockholder | 400,794 | 400,794 |
| Totals | $ 485,153 | $ 485,153 |

*SABA Asset Purchase*

As of December 31, 2021 and 2020, EMC owed $33,359, and $33,359, respectively, on the loan from Central Bank FSG related to the SABA Asset Purchase Agreement dated March 5, 2007. EMC has not been able to obtain clear title of the construction equipment for the purpose of selling the equipment to recover funds to repay the bank loan.

## Note 8. Commitments

On October 20, 2020, the Company entered into a three-year employment agreement with four of its executive officers. Each executive officer is entitled to a base salary of $120,000 per year and 5,000,000 stock options. The stock options have a term of three years and vest ratably over a two-year period commencing on October 20, 2020. The stock options have an exercise price $0.01030. For the year ended December 31, 2021 and 2020, the estimated fair value of the stock option was deminimis.

## Note 9. Stock-Based Compensation Expense

For the years ended December 31, 2021 and 2020, the Company recorded stock-based compensation expense of $303,440 and $2,135,856, respectively.

Components of stock-based compensation expense are as follows:

### *Series B Convertible Preferred Stock*

63

The Company estimated the prices of the issuances of the Series B Convertible Preferred Stock by obtaining a valuation report since there was no sales of the Series B Convertible Preferred stock in 2021 and 2020.

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

*Year ended December 31, 2020*

The Company recorded $170,000 of stock-based compensation expense for the issuance of 100,000,000 shares of Series B Convertible Preferred Stock valued at an estimated fair market value of $0.0017 per share to the controlling stockholder of Enzolytics for agreeing to allow his past due accrued salary owed to him to be included pursuant to Section 251(g) of the DGCL. The $170,000 was recorded to general and administrative expenses in the Company's consolidated of statement of operations.

The Company recorded $347,531 of stock-based compensation expense for the issuance of 204,430,000 shares of Series B Convertible Preferred Stock valued at an estimated fair market value of $0.0017 per share for the purchase of the intellectual property rights of an license owned by certain officers of BioClonetics. The $347,531 was recorded to research and development expenses in the Company's consolidated of statement of operations.

The Company recorded $154,275 of stock-based compensation expense for issuance of 90,750,000 shares valued at an estimated fair market value of $0.0017 per share for the purchase of the intellectual property rights of a licensed patented owned by a controlling stockholder of Enzolytics. The $154,275 was recorded to research and development expenses in the Company's consolidated of statement of operations.

*Common Stock Year ended December 31, 2020*

The Company recorded $1,464,000 of stock-based compensation expense of which $610,000 was recorded to general and administrative expenses and $854,000 was recorded to consulting for the issuance of 120,000,000 shares of common stock for various services at a price of $0.0122 per share, which represents the Company's common stock price on the date of grants.

**Note 10. Preferred Stock**

The Company's certificate of designation authorizes the following classes of Preferred Stock: Series A, Series B and Series C.

*Series A*

*Shares Authorized.* Up to 60,000,000 shares at par value of $0.0001 per share.

*Designation and Rank.* The Series A Preferred Stock shall rank: (i) senior to any other class or series of outstanding preferred shares or series of capital stock of the Company; (ii) prior to all of the Company's common stock, no par value per share; (iii) prior to any class or series of capital stock of the Company hereafter created not specifically ranking by its terms senior to or on parity with any Series A Preferred Stock of whatever subdivision (collectively, with the common stock and the existing preferred stock, "Junior Securities"); and (iv) on parity with any class or series of capital stock of the Company hereafter created specifically ranking by its terms on parity with the Series A Preferred Stock ("Parity Securities") in each case as to distributions of assets upon liquidation, dissolution or winding up of the Company, whether voluntary or involuntary (all such distributions being referred to collectively as "Distributions").

*Dividends.* The holders of the Series A Preferred Stock are not entitled to receive dividends.

*Super Majority Voting Rights.* The record holders of the Series A Preferred Shares shall have the right to vote on any matter with holders of common stock voting together as one (1) class. The record holders of the Series A Preferred Shares shall have that number of votes (identical in every other respect to the voting rights of the holders of other series of voting preferred shares and the holders of common stock entitled to vote at any regular or special meeting of the shareholders) equal to that number of common shares which is not less than 51% of the vote required to approve any action, which Delaware law provides may or must be approved by vote or consent of the holders of other series of voting preferred shares and the holders of common shares or the holders of other securities entitled to vote, if any. For purposes of determining the number of votes, each one (1) share of the Series A Preferred shall have voting rights equal to (x) 0.019607 multiplied by the total issued and outstanding common stock eligible to vote at the time of the respective vote (the "Numerator"), divided by (y) 0.49, minus (z) the Numerator.

*Redemption Rights.* There are no redemption rights.

**64**

*Liquidation Preference.* In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, the holders of shares of Series A Preferred Stock shall be entitled to receive, immediately after any distributions to senior securities required by the Company's Certificate of Incorporation or any certificate of designation, and prior in preference to any distribution to Junior Securities but in parity with any distribution to

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

Parity Securities, an amount per share equal to $.01 per share. If upon the occurrence of such event, and after payment in full of the preferential amounts with respect to the Senior Securities, the assets and funds available to be distributed among the holders of the Series A Preferred Stock and Parity Securities shall be insufficient to permit the payment to such holders of the full preferential amounts due to the holders of the Series A Preferred Stock and the Parity Securities, respectively, then the entire assets and funds of the Company legally available for distribution shall be distributed among the holders of the Series A Preferred Stock and the Parity Securities, pro rata, based on the respective liquidation amounts to which each such series of stock is entitled by the Company's Certificate of Incorporation and any certificate(s) of designation relating thereto.

**Series B**

*Shares Authorized.* Up to 465,000,000 shares at par value of $0.0001 per share.

*Designation and Rank.* The Series B Preferred Stock shall be subordinate to and rank junior to all indebtedness of the Company as well as the Series A Preferred Stock to the extend provided in the Certificate of Designation for the Series A Preferred Stock with the Series B Preferred Stock on the same footing as the Common Stock and Series A Preferred Stock.

*Dividends.* The holders of the Series B Preferred Stock are not entitled to receive dividends.

*Voting Rights.* The holders of Series B Preferred Stock shall have the right to cast 10 votes for each share held of record on all matters submitted to a vote of holders of the Corporation's common stock, including the election of directors, and all other matters as required by law. There is no right to cumulative voting in the election of directors. The holders of Series B Preferred Stock shall vote together with all other classes and series of common stock of the Company as a single class on all actions to be taken by the common stockholders of the Company except to the extent that voting as a separate class or series is required by law.

*Liquidation Preference.* In the event of any dissolution, liquidation or winding up of the Company whether voluntary or involuntary, the holders of Series B Preferred Stock shall be entitled to participate in any distribution out of the assets of the Company on an equal basis per share with the holders of the Common Stock and Series A Preferred Stock.

*Conversion Rights.* The holders of Series B Preferred Stock shall have conversion rights as follows: Each share of Series B Preferred Stock shall be convertible at the option of the holder thereof and without the payment of additional consideration by the holder thereof, at any time, into shares of Common Stock in accordance with the stock designations filed with the office of the Delaware Secretary of State

**Issuances of Series B Convertible Preferred Stock**

As part of the agreement whereby ENZC became 50% owner of the Bulgarian Entity in a joint venture, International Medical Partners, LLC (IMPL) the Company issued 2,000,000 shares of Series B Preferred Stock relating to the investment in IMPL for $800,000 and granted a distributorship for ITV-1 in exchange for which IMPL shall fund certain costs for ITV-1 European Medical Agency permitting of ITV-1. The agreement was signed March 16, 2021. The shares of Series B were issued on August 11, 2021. The territories covered by the distribution agreement are Russia, Georgia, Ukraine, Moldova, Belarus, Armenia, Azerbaijan, Kazakhstan, Uzbekistan, Turkmenistan, Kyrgyzstan, Tajikistan, Estonia, Latvia and Lithuania.

During the year ended December 31, 2020, the Company issued 50,000,000 shares of Series B Preferred Stock relating to consulting services recognized in 2019. Refer to Note 9 Stock-Based Compensation Expense for all other Series B Convertible Preferred Stock issuances.

**Series C**

*Shares Authorized.* Up to 10,000,000 shares at par value of $0.0001 per share.

**65**

*Dividends.* In each calendar year, the holders of the then outstanding shares of Series C Convertible Preferred Stock shall be entitled to receive, when, as and if declared by the Board, out of any funds and assets of the Company legally available therefore, noncumulative dividends in an amount equal to any dividends or other distribution on the Common Stock in such calendar year on an as-converted to-Common- Stock basis. No dividends shall be paid, and no Distribution shall be made, with respect to the Common Stock unless dividends in such amount shall have been paid or declared and set apart for payment to the holders of the Series C Convertible Preferred Stock simultaneously. Dividends on the Series C

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

Convertible Preferred Stock shall not be mandatory or cumulative, and no rights or interest shall accrue to the holders of the Series C Convertible Preferred Stock.

*Conversion Rights.* Each share of Series C Convertible Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the issuance of such shares, in accordance with the stock designations filed with the office of the Delaware Secretary of State. Notwithstanding the foregoing, in no event shall any holder of shares of Series C Convertible Preferred Stock be entitled to convert any shares of Series C Convertible Preferred Stock, and the Corporation shall not effect any conversion of the Series C Convertible Preferred Stock, to the extent that the number of shares of Common Stock issuable upon the conversion would result in beneficial ownership by the holder, its affiliates and any persons acting as a group together with such holder or its affiliates of more than 4.99% of the outstanding shares of Common Stock immediately after giving effect to the issuance of shares of Common Stock issuable upon conversion of the Series C Convertible Preferred Stock held by the applicable holder.

*Redemption Rights.* There are no redemption rights.

*Voting Rights:* Each share of Series C Convertible Preferred Stock shall be entitled to 100 votes on all matters to come before the Common Stock stockholders.

**Series C Convertible Preferred Stock Issuances**

*Year ended December 31, 2020*

***Securities Exchange Agreements***

On November 16, 2020, the Company entered into Securities Exchange Agreements with two investors. Under the terms of the Securities Exchange Agreements, the Company issued 941,078 shares of its Series C Convertible Preferred Stock and 188,215,600 warrants to purchase 188,215,600 shares of its common stock in exchange for payment of various notes and accrued interest totaling $470,539 to these investors. Each share of the Series C Convertible Preferred Stock is convertible at price of $0.005 anytime at the option of the investors. The warrants have an exercise price of $0.00750 per share and expire on November 16, 2023. The Company valued the Series C Convertible Preferred Stock at a price $0.50 per share which was based on subsequent subscription agreements entered in December 2020 (discussed below).

Both the Series C Convertible Preferred Stock and the warrants are equity instruments under ASC 480 and ASC 815-40. On November 16, 2020, the Company initially recorded a beneficial conversion feature of $470,445 based on the fair values of the Series C Convertible Preferred Stock and warrants and the difference between the Company's common stock price. The Company estimated the fair value of the warrants using the Black-Scholes option pricing model based on the following assumptions: (1) expected volatility of 398%, (2) risk-free rate of 0.24% and (3) 3 year contractual term.

The Company recorded the beneficial conversion feature of $470,445 in its consolidated statement of changes in stockholders' deficit for the year ended December 31, 2020. On November 16, 2020, since the Series C Convertible Preferred Stock does not have a stated maturity date and is convertible anytime at the option of the investors, the beneficial conversion feature is fully amortized at issuance and recorded as a deemed dividend. Since the Company has an accumulated deficit, the deemed dividend was charged against additional paid-in capital.

***Subscription Agreements***

In December 2021, the Company entered into subscription agreements to issue Series C Convertible Preferred Stock to the same two investors who were investors in the Securities Exchange Agreements on November 16, 2020. Under the terms of the subscription agreements, the investors purchased 1,763,324 shares of Series C Convertible Preferred Stock and warrants to purchase 1,763,324 shares of the Series C Convertible Preferred Stock at a price of $0.50 per share resulting in a carrying value of $881,662. Each share of the Series C Convertible Preferred Stock is convertible at price of $0.005 into shares of common stock anytime at the option of the investors. The warrants have an exercise price of $0.00750 per share and a term of three years and are exercisable anytime. **66**

In December 2020, the Company entered into subscription agreements to issue Series C Convertible Preferred Stock to the same two investors who were investors in the Securities Exchange Agreements on November 16, 2020. Under the terms of the subscription agreements, the investors purchased 1,763,324 shares of Series C Convertible Preferred Stock and warrants to purchase 1,763,324 shares of the Series C Convertible Preferred Stock at a price of $0.50 per

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

share resulting in a carrying value of $881,662. Each share of the Series C Convertible Preferred Stock is convertible at price of $0.005 into shares of common stock anytime at the option of the investors. The warrants have an exercise price of $0.00750 per share and a term of three years and are exercisable anytime.

As of December 31, 2020, the Company has not issued the 1,763,324 shares of the Series C Convertible Preferred Stock. As a result, the Company has recorded $176 to Preferred Stock Subscribed based on the par value of $0.0001 and the remaining balance of $881,486 was record to Additional Paid-in Capital Subscribed in its consolidated balance sheet as of December 31, 2020.

The subscription agreements consisted of the Company receiving cash proceeds of $805,000 from the investors and the investors exchanging various notes and accrued interest totaling $76,662 for Series C Convertible Preferred Stock.

Both the Series C Convertible Preferred Stock and the warrants are equity instruments under ASC 480 and ASC 815-40. In December 2020, the Company initially recorded a beneficial conversion feature of $881,662 based on the fair values of the Series C Convertible Preferred Stock and warrants and the difference between the Company's common stock prices on the dates of the subscription agreements. The Company estimated the fair value of the warrants using the Black-Scholes option pricing model based on the following assumptions: (1) expected volatility of 392%, (2) risk-free rate of 0.17% and (3) 3-year contractual term.

The Company recorded the beneficial conversion feature of $881,662 in its consolidated statement of changes in stockholders' deficit for the year ended December 31, 2020. Since the Series C Convertible Preferred Stock does not have a stated maturity date and is convertible anytime at the option of the investors, the beneficial conversion feature is fully amortized at the issuance dates and recorded as a deemed dividend. Since the Company has an accumulated deficit, the deemed dividend was charged against additional paid- in capital.

*Series E*

*Shares Authorized.* Up to 10,000,000,000 shares at par value of $0.0001 per share.

*Dividends.* The holders of the Series E Preferred Stock are not entitled to receive dividends.

*Voting Rights.* The holders of Series E Preferred Stock shall have the right to cast 10 votes for each share held of record on all matters submitted to a vote of holders of the Corporation's common stock, including the election of directors, and all other matters as required by law. There is no right to cumulative voting in the election of directors. The holders of Series E Preferred Stock shall vote together with all other classes and series of common stock of the Company as a single class on all actions to be taken by the common stockholders of the Company except to the extent that voting as a separate class or series is required by law.

*Liquidation Preference.* In the event of any dissolution, liquidation or winding up of the Company whether voluntary or involuntary, the holders of Series E Preferred Stock shall be entitled to participate in any distribution out of the assets of the Company on an equal basis per share with the holders of the Common Stock and Series A, Series B and Series C Preferred Stock.

*Conversion Rights.* The holders of Series E Preferred Stock shall have conversion rights as follows: Each share of Series E Preferred Stock shall be convertible at the option of the holder thereof and without the payment of additional consideration by the holder thereof, at any time, into shares of Common Stock in accordance with the stock designations filed with the office of the Delaware Secretary of State

**Issuances of Series E Convertible Preferred Stock**

During the year ended December 31, 2021, the Company issued 2,500,000 shares of Series E Preferred Stock for $2,000,000.

**Common stock**

*Shares Authorized:* Up to 3,000,000,000 shares at par value of $0.0001 per share.

67

**Issuances of Common Stock other than for Stock-Based Compensation:**

*Year ended December 31, 2021*

ENZOLYTICS, INC.
and Subsidiaries
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2021 and 2020

The Company issued no shares of common stock.

*Year ended December 31, 2020*

The Company issued 25,000,000 shares of common stock and received cash proceeds of $5,050.

The Company issued 317,973,000 shares of common stock in connection with a 2018 settlement agreement.

The Company issued 1,064,941,894 shares of common stock for payment of a notes payable to investors and accrued interest totaling $187,423.

The Company issued 200,000,000 shares of common stock for conversion of 20,000,000 shares of Series B Convertible Preferred Stock.

**Note 12. Subsequent Events**

**On January 4, 2022** ENZC announced production and sale in the U.S. and North America of "Enzolytics IPF Immune™," a science-backed liquid nutritional supplement that acts to strengthen the body's immune system.

**On February 21, 2022** Enzolytics, Inc. announced its plans for entry into the diagnostics market. Enzolytics has filed a comprehensive U.S. and foreign Patent Cooperation Treaty (PCT) Patent Application covering its invention of a novel, innovative technology for improved diagnostics.

**On February 28, 2022** Enzolytics, Inc. announced the addition of Dr. Suraj Kumar Saggar to its Advisory Board. Dr. Saggar brings to the Company his vast experience as a physician and healthcare research professional with an established track record of exceptional performance in healthcare operations, clinical trials, and regulatory compliance.

**On March 14, 2022** Enzolytics, Inc. wholly-owned subsidiary Virogentics, Inc. (the "Subsidiary") announced its progress toward the production and use of its ITV-1, anti-HIV immunotherapy treatment in the Central and Eastern regions of Africa for patients with HIV/AIDS.

**On March 25, 2022** In submissions under the Patent Cooperation Treaty (PCT), Enzolytics, Inc. has pending international patent applications covering the use of any of its discovered numerous conserved Coronavirus epitopes or conserved HIV epitopes in the production of monoclonal antibodies, the production of vaccines or use in diagnostic tests for detecting the viruses in patients.

**On June 21, 2022** Enzolytics, Inc. announced it has identified conserved, immutable sites (epitopes) on the Monkeypox virus. These discoveries are a part of Enzolytics' continuing efforts to address future healthcare needs in pandemics using its Comprehensive Artificial Intelligence (AI) protocol for producing Monoclonal Antibodies, including implementing AI analysis of existing viruses and any new virus immediately upon its emergence globally.

**On June 28, 2022** Enzolytics, Inc. announced the first Official Action on the Company's International Patent Application covering its discovery and exclusive claim to conserved antigens and epitopes of the HIV virus, the PCT International Search Report concluded that inventions claimed therein are novel and inventive and thus will expectedly be issued in final international patents.

**On September 14, 2022** Enzolytics, Inc. announced the successful conclusion, in a Delaware Federal litigation, 21-CV-01163-RGA, brought by Peter Mergenthaler against Enzolytics. Enzolytics' Motion to Dismiss was granted by the Federal District Court terminating the case. In the case, an ENZC shareholder sought to require the Company to replace 10,000,000 ENZC shares that Plaintiff claimed were allegedly stolen by third parties. The Court found "that Plaintiff has not stated a plausible claim to relief" and as a result, the Court granted Enzolytics' Motion to Dismiss. The case is now terminated. "The Judge's decision in this frivolous case is a victory for all our shareholders," said ENZC CEO Charles Cotropia. "This lawsuit was wrongfully brought, making it necessary for the Company to defend against a meritless claim. Taking such action is necessary to protect shareholder value. We must remain diligent and defend against any such attempts that degrade shareholder value." **68**

**On October 3, 2022** Enzolytics, Inc. announced the completion of the first phase of the animal toxicology studies on its ITV-1 anti-HIV therapeutic. The initial toxicology study showed "no adverse effects at maximal dose of the product" and confirmed the product is safe at maximum dose, leading the way for a GLP Compliant 28-day Repeat Dose Toxicity Study.

**ENZOLYTICS, INC.**
**and Subsidiaries**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**YEARS ENDED DECEMBER 31, 2021 and 2020**

**On October 24, 2022** Enzolytics, Inc. announced the addition of Dr. Kirsten Bischof to its Advisory Board. Dr. Bischof brings the Company her vast experience as a Surgeon and healthcare research professional with an established track record of exceptional performance in healthcare.

**On December 14, 2022,** The Company announced its dietary supplement that supports the body's self-defense system is now available for sale in the United States (www.onelavi.com) and will be widely available through national retailers and their internet platforms and websites. The Company is having additional production of IPF Immune to meet demand.

69

**ENZOLYTICS, INC.**
**NOTES TO FINANCIAL STATEMENTS**
**NINE MONTHS ENDED SEPTEMBER 30, 2021**

### (1)    Basis of Presentation and Organization

Enzolytics, Inc. ("Enzolytics" or the "Company") is a Delaware corporation. On November 25, 2004, the Company changed its name to Falcon Media Services, Ltd. On November 12, 2008, the Company changed its name to Extreme Mobile Coatings Corp., Ltd. On March 2, 2009, the Company changed its name to Extreme Mobile Coatings Worldwide Corp. On May 19, 2010, the Company changed its name to Structural Enhancement Technologies Corporation ("Structural"). On November 16, 2012, the Company changed its name to Eco-Petroleum Solutions, Inc. ("Eco-Petroleum"). On March 22, 2018, the Company changed its name to Enzolytics, Inc. ("Enzolytics").

On March 9, 2017, the Company entered into an agreement with the shareholders of Immunotech Laboratories, Inc. (Immunotech) to acquire all of the outstanding shares, both preferred and common stock, of Immunotech for 60,000,000 shares of the Company's Series A preferred stock and 391,578,947 shares of the Company's Series B preferred stock.  The current shareholders of Immunotech's ownership of the Company will not be less than the equivalent of 80% of the issued and outstanding shares of ECPO common stock at any given time.  At the effective time of the Acquisition, all options to acquire common stock of Immunotech issued and outstanding, whether vested or unvested, shall automatically be converted into and become options to purchase shares of Common Stock.  Immunotech's 200 Million outstanding Series B Preferred convert one for two but do have a voting preference and shall be exchanged for 100 Million Series B Preferred shares of ECPO with the exact same voting preferences as the Immunotech Series B Preferred.  The Series B outstanding will be included in the 80% calculation for the Newly Created Preferred.  The Company will issue 291,578,947 series B preferred in exchange of 574,964,967 of common stock of Immunotech.  As part of the share exchange agreement, all the liabilities of Immunotech Laboratories, Inc. were assumed by Enzolytics Solutions, Inc.

On June 22, 2017, Eco Petroleum Solutions, Inc. (OTC Markets "ECPO" or the "Company") announces that IMMB BG, a subsidiary of Immunotech Laboratories, Inc., the Company's subsidiary, has issued an exclusive Distribution Agreement (the "Agreement") for the territory of the Ukraine to LLC Project Development and Implementation Centre Omega ("Omega"). The term of the agreement is for an initial ten-year period with an option to renew the agreement for an additional ten years. The Agreement establishes a price of €3,300 (Euros) per one 8-week cycle of injections or 16 vials. The treatment protocol requires two 8-week cycles of injections administered twice a week with a one-week break between cycles. The ITV-1 treatment will be administered with a combination of different variations of Protease Inhibitors used in the treatment of HIV/AIDS.

On October 1st, 2017, the company amended the consulting Agreement entered in June of 2014 between Immunotech Laboratories, Inc and Camelot Nevada Trust. The original agreement was for accounting and business development services with the amount invoiced being payable in cash or shares at the election of the Company when paid. The original conversion feature was set at a Fifty Percent (50%) discount to the lowest bid price in the proceeding 30 days of the original invoice of Immunotech Laboratories, Inc. The Company has negotiated a fixed price of $.004 with a reset upon the issuance of any convertible instrument with a lower conversion price. The first payment due under the amended contract is upon the shipping of the first order. There is a default provision for non-payment and a cure period. Payment in stock or cash at the Company's election applies. The balance accrued under this contract, included in the accounts payable balance is $412,500.00 at September 30, 2017. This payable along with all the other liabilities of Immunotech Laboratories, Inc were assumed by the Company on March 9, 2017 as part of the Share Exchange Agreement.

- 70

**ENZOLYTICS, INC.**
**NOTES TO FINANCIAL STATEMENTS**
**NINE MONTHS ENDED SEPTEMBER 30, 2021**

On January 15, 2018, the merger agreement with Immunotech Laboratories, Inc. was terminated except for Section 1.03(d)(i) which relates to the appointment of Harry Zhabilov as Chairman and CEO of ECPO which remained in effect.

On March 26, 2018, an asset purchase agreement was entered into with Immunotech Laboratories, Inc whereby the Exclusive License Agreement for the Patented Immunotherapy Treatment for the care of HIV/Aids and Hepatitis C patients, Forty Nine Percent ownership in Immunotech Laboratories BG, all equipment and intellectual property associated with the Patented treatment was purchased in exchange for a note payable and common stock of Enzolytics, Inc. issued to Immunotech Laboratories, Inc. and assumption of certain debt from Immunotech by Enzolytics, Inc. This debt included, but it not limited to the Zhabilov Trust Fee of $1,550,000, the Camelot Nevada Trust Payable of $530,000, Investors Loans of $224,469 and Other Advances of $282,500.

On June 25, 2018, the Company entered into a settlement agreement and stipulation ("Settlement Agreement") with Livingston Asset Management LLC ("Livingston") in connection with the settlement of $563,000 of bona fide obligations the Company owed to certain of its creditors. The Settlement Agreement was subject to Federal court fairness hearing, and on August 21, 2018 a Federal court granted approval of the Settlement Agreement. If satisfied in full, pursuant to the Settlement Agreement the Company shall reduce the Company's debt obligations in exchange for the issuance of 563,000,000 shares of Company's common stock, in multiple tranches, pursuant to the terms of section 3(a)(10) of the Securities Act of 1933, as amended. At no time may Livingston beneficially own more than 9.99% of the Company's outstanding common stock. In connection with the transaction, the Company issued to Livingston a convertible promissory note in the principal amount of $100,000 bearing interest of 10% per year to cover legal fees and other expenses, The Note is convertible into shares of the Company's common stock at 50% of the lowest closing bid price for 10 trading days prior to the date of conversion. Under the terms of a separate engagement letter, in connection with the settlement agreement, the Company is to pay a registered placement agent ten percent (10%) of the dollar amount of creditor obligations extinguished pursuant to the settlement agreement. As of December 31, 2020, 23,248,889 shares have been converted.

The Company focuses on Research and Development in the Bio-Tech Field as a drug development company committed to the commercialization of its proprietary proteins known as IRREVERSIBLE PEPSIN FRACTION (IPF) ITV-1 for the treatment of debilitating infectious disease such as HIV and Hepatitis Type C. These drugs have not been approved by the FDA, but the Company has begun pre-clinical trial testing. The Company has also begun the final phase of clinical trials during the period ended March 31, 2016 in Bulgaria through a minority owned entity, Immunotech Laboratories, BG ("ILBG") which IMMB owns 49%. The Clinical Trials were successfully completed Bulgaria in the fourth quarter of 2016. In pursuit of this strategy, in December of 2009 we entered into a Licensing Agreement (the "Agreement"), with the Zhabilov Trust, a California Trust ("Z Trust" or the "Seller") and the Trustees of the Z Trust ("Trustees"). Pursuant to the terms of the Agreement, we agreed to pay $1,550,000 Licensing fee to the Trust for exclusive rights to the Patent for proteins to be used to develop a drug treatment for HIV. The exclusivity is for a period of 20 years with approximately 12 years remaining.

On April 16, 2020, the Company announced its new physical address and telephone number, 2000 N. Sentra Express Way, Unit 104, Plano, Texas 75074, telephone number, (972) 292-9414.

**71**

# ENZOLYTICS, INC.
## NOTES TO FINANCIAL STATEMENTS
### NINE MONTHS ENDED SEPTEMBER 30, 2021

On April 30, 2020, the Company filed Foreign Profit Corporation Article of Continuance pursuant to Wyoming Statute W.S. 17-16-1810 to redomicile the Company from Delaware to Wyoming and increasing the authorized common shares to three billion.  On May 21, 2020, the Company was approved by the State of Wyoming.

On September 15, 2020, Enzolytics, Inc. and BioClonetics Immunotherapy, Inc., a biotech company located in Dallas, TX, announced the execution of a Letter of Intent to merge the two entities together with the intent to combine the two proprietary technologies to evaluate the beneficial effects and increased binding capabilities for use in primate studies at the California National Primate Research Center, University of California, Davis, California.

On October 22, 2020, the Company announced the appointment, by the Board of Directors of the Company, on October 20, 2020, of Charles Cotropia to the position of CEO of Enzolytics. Mr. Cotropia also serves as CEO of the Company's Merger target BioClonetics Immunotherapeutics, and Harry Zhabilov the former CEO of the Company has taken the position of CSO. Charles Cotropia was appointed to the Company's Board of Directors on October 1, 2020. Simultaneously, Harry Zhabilov was appointed to the BioClonetics Immunotherapeutics board.

On November 16, 2020, the issuer (having been renamed, immediately prior to this Holding Company Reorganization, from "Enzolytics, Inc." to "ENZC SUB, Inc.") completed a corporate reorganization (the "Holding Company Reorganization") pursuant to which ENZC SUB, Inc., as previously constituted (the "Predecessor") became a direct, wholly-owned subsidiary of a newly formed Delaware corporation, Enzolytics, Inc. (the "Holding Company"), which became the successor issuer. In other words, the Holding Company is now the public entity. The Holding Company Reorganization was effected by a merger conducted pursuant to Section 251(g) of the Delaware General Corporation Law (the "DGCL"), which provides for the formation of a holding company without a vote of the stockholders of the constituent corporations.

In accordance with Section 251(g) of the DGCL, Enzolytics Merger Corp. ("Merger Sub"), another newly formed Delaware corporation and, prior to the Holding Company Reorganization, was an indirect, wholly owned subsidiary of the Predecessor, merged with and into the Predecessor, with the Predecessor surviving the merger as a direct, wholly owned subsidiary of the Holding Company (the "Merger"). The Merger was completed pursuant to the terms of an Agreement and Plan of Merger among the Predecessor, the Holding Company and Merger Sub, dated November 16, 2020 (the "Merger Agreement").

As of the effective time of the Merger and in connection with the Holding Company Reorganization, all outstanding shares of common stock and preferred stock of the Predecessor were automatically converted into identical shares of common stock or preferred stock, as applicable, of the Holding Company on a one-for-one basis, and the Predecessor's existing stockholders and other holders of equity instruments, became stockholders and holders of equity instruments, as applicable, of the Holding Company in the same amounts and percentages as they were in the Predecessor prior to the Holding Company Reorganization.

The executive officers and board of directors of the Holding Company are the same as those of the Predecessor in effect immediately prior to the Holding Company Reorganization.

72

For purposes of Rule 12g-3(a), the Holding Company is the successor issuer to the Predecessor, now as the sole shareholder of the Predecessor. Accordingly, upon consummation of the Merger, the Holding Company's common stock was deemed to be registered under Section 12(b) of the Securities Exchange

**ECO-PETROLEUM SOLUTIONS, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO FINANCIAL STATEMENTS**
**SEPTEMBER 30, 2014, AND 2013**
**(Unaudited)**

**(1)     Summary of Significant Accounting Policies**

*Basis of Presentation and Organization*

Eco-Petroleum Solutions, Inc. ("Eco-Petroleum" or the "Company") is a Delaware corporation in the development stage. The Company was incorporated under the laws of the United Kingdom as T&T Homes Limited on July 28, 2004. On November 25, 2004, the Company changed its name to Falcon Media Services, Ltd. On November 12, 2008, the Company changed its name to Extreme Mobile Coatings Corp., Ltd. On March 2, 2009, the Company changed its name to Extreme Mobile Coatings Worldwide Corp. On May 19, 2010, the Company changed its name to Structural Enhancement Technologies Corp. ("Structural"). Lastly, on November 16, 2012, the Company amended its name to Eco-Petroleum Solutions, Inc. to indicate a change in its business plan to expand its operations by entering into the renewable sector to conduct the business of blending, bottling, and distributing reprocessed private label motor oil, transmission fluid, and related products for the automotive aftermarket.

On September 16, 2008, the Company entered into a Share Exchange Agreement (the "Share Exchange Agreement #1") with Extreme Mobile Coatings, Inc. ("EMC"), a Delaware corporation, and its stockholders pursuant to which the Company agreed to acquire 100 percent of the outstanding shares of EMC in exchange for 2,701 shares of common stock (post reverse stock split) of the Company. On that date, the Company began to focus on a new business plan, which was the establishment of franchises to market, use, and sell coating products and equipment from Environmental Infrastructure Holdings Corp. ("EIHC" and formerly XIOM Corp.) The Company continued with that business plan (with the EIHC technology) until early January 2011. At that time, the EIHC License Agreement was written off, and the Company entered into a new license agreement with another coating products provider.

Given that EMC is considered to have acquired the Company by a reverse merger through the Share Exchange Agreement #1, and its former stockholders had voting control of the Company, the accompanying financial statements and related disclosures in the notes to financial statements present the financial position as of September 30, 2014, and December 31, 2013, and the operations for the three-month and nine-month periods ended September 30, 2014, and 2013, and cumulative from inception of EMC under the name of Eco-Petroleum. The reverse merger was recorded as a recapitalization of the Company, with the net assets of EMC and Eco-Petroleum brought forward at their historical bases. The costs associated with the reverse merger were expensed as incurred (see Note 7 for additional information pertaining to discontinued operations).

On March 2, 2009, the Company completed a second Share Exchange Agreement (the "Share Exchange Agreement #2") between the Company, as Extreme Mobile Coatings Corp, Ltd. and Extreme Mobile Coatings Worldwide Corp., a newly formed Delaware corporation. The Share Exchange Agreement #2 was completed in order to change the domicile of the Company from the United Kingdom to the State of Delaware, the authorized common stock to 500,000,000 shares, par value $0.0001 per share, and the name of the Company from Extreme Mobile Coatings Corp. Ltd. to Extreme Mobile Coatings Worldwide Corp. The Company exchanged 3,583 shares of its common stock (post reverse stock split) for a like number of shares of common stock of the newly formed Delaware Corporation. In addition, the Certificate of Incorporation of Extreme Mobile Coatings Worldwide Corp. became the Certificate of Incorporation of the Company.

**73**

ECO-PETROLEUM SOLUTIONS, INC.
(A DEVELOPMENT STAGE COMPANY)
NOTES TO FINANCIAL STATEMENTS
SEPTEMBER 30, 2014, AND 2013
(Unaudited)

On November 25, 2008, the Company effected a 2-for-1 forward stock split of its common stock. Effective March 12, 2009, the Company effected a 5-for-1 forward stock split of its common stock. On May 19, 2010, the Company effected a 1-for-100 reverse stock split of its issued and outstanding common stock. On November 16, 2012, the Company changed its name to Eco-Petroleum Solutions, Inc. and effected a 1-for-500 reverse stock split of its issued and outstanding common stock. Such actions were completed on February 7, 2013. The accompanying financial statements have been retroactively adjusted to reflect these stock splits.

74

# ECO-PETROLEUM SOLUTIONS, INC.

## (A DEVELOPMENT STAGE COMPANY)

## FINANCIAL STATEMENTS

### (Unaudited)

### SEPTEMBER 30, 2014, AND 2013

# Disclosure Statement Pursuant to the Pink Basic Disclosure Guidelines

# ENZOLYTICS, INC.

1101 Raintree Circle, Suite 130, Allen, Texas 75013

_____

(972)-292-9414
www.enzolytics.com
info@enzolytics.com
SIC Code 541711

# Annual Report

### For the period ending December 31, 2022
### (the "Reporting Period")

## Outstanding Shares

The number of shares outstanding of our Common Stock was: 2,830,435,953 as of December 31, 2022.

The number of shares outstanding of our Common Stock was 2,830,435,953 as of September 30, 2022

The number of shares outstanding of our Common Stock was 2,797,935,953 as of December 31, 2021.

## Shell Status

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933, Rule 12b-2 of the Exchange Act of 1934 and Rule 15c2-11 of the Exchange Act of 1934):

Yes: ☐     No: ☒

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐     No: ☒

## Change in Control

Indicate by check mark whether a Change in Control[1] of the company has occurred over this reporting period:

Yes: ☐     No: ☒

**1)   Name and address(es) of the issuer and its predecessors (if any)**

In answering this item, provide the current name of the issuer any names used by predecessor entities, along with the dates of the name changes.  The name of the issuer is Enzolytics, Inc.

| | |
|---|---|
| Immunotech Laboratories, Inc | September 11, 2017 |
| Eco-Petroleum Solutions, Inc. | November 16, 2012 |

76

[1] "Change in Control" shall mean any events resulting in:

(i) Any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becoming the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the total voting power represented by the Company's then outstanding voting securities;
(ii) The consummation of the sale or disposition by the Company of all or substantially all of the Company's assets;
(iii) A change in the composition of the Board occurring within a two (2)-year period, as a result of which fewer than a majority of the directors are directors immediately prior to such change; or
(iv) The consummation of a merger or consolidation of the Company with any other corporation, other than a merger or consolidation which would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) at least fifty percent (50%) of the total voting power represented by the voting securities of the Company or such surviving entity or its parent outstanding immediately after such merger or consolidation.

of the average closing price of the common stock of the Company on the five trading days prior to exercise. As of December 31, 2022, and 2021, the promissory note was in default. The promissory note is guaranteed by shares of common stock of the Company owned by James W. Zimbler, a Director and stockholder of the Company and was subject to the 251g reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On September 25, 2013, the Company issued an $50,000 10% unsecured convertible note to an investor due December 24, 2013. Under the terms of the note agreement, the note may be repaid with appropriate interest to the investor by the Company on the earlier of the due date or the date the Company raises in excess of $500,000 from its current capital formation activities, or all or a portion of the principal and accrued and unpaid interest may be converted, at the election of the investor into shares of common stock of the Company at a price equal to 85% of the market price (meaning the average of the lowest two trading prices for the five-day trading period before the date of conversion) of the Company's common stock. As of December 31, 2022, and 2021, the promissory note was in default, and the Company obtained a written waiver from the investor dated March 26, 2014, and a subsequent verbal waiver, confirming that all terms and conditions contained in the promissory note would remain in effect as the Company was continuing with its capital formation activities. Further, on February 11, 2014, the Company issued 100,000 shares of common stock to the note holder, with a value of $5,000, as an incentive to continue working with the Company on its capital formation and other merger activities and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On October 18, 2013, the Company issued a $100,000 10% unsecured convertible note due January 16, 2014 to the same investor as the September 25, 2013 note. Under the terms of the note agreement, the note may be repaid with appropriate interest to the investor by the Company on the earlier of the due date or the date the Company raises in excess of $750,000 from its current capital formation activities, or all or a portion of the principal and accrued and unpaid interest may be converted, at the election of the investor into shares of common stock of the Company at a price equal to 85% of the market price (meaning the average of the lowest two trading prices for the five day trading period before the date of conversion) of the Company's common stock. As of December 31, 2022, and 2021, the promissory note was in default, and the Company obtained a written waiver from the investor dated March 26, 2014, and a subsequent verbal waiver, confirming that all terms and conditions contained in the promissory note would remain in effect as the Company was continuing with its capital formation and other merger activities. This loan was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

A debt purchase agreement was entered in on January 29, 2015. On February 10, 2015, the Company issued a total of 10,000,000 shares to Mr. Mergenthaler in settlement of $190,000 of the amount due him, reducing the total amount owed of the note payable from $283,500 to the amount of $71,500. On December 31, 2022 and 2021, the balance was $59,800 and was subject to the 251(g) reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc.

On March 9, 2017, the Company issued an $25,000 12% unsecured convertible to an investor due March 9, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the note investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. Note was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On May 26, 2017, the Company issued an $5,000 12% unsecured convertible note to an investor due June 23, 2018. Under the terms of the note agreement, the note may be either repaid, at the election of the investor in cash or the issuance of shares of common stock of the Company at a discount to market equal to 50% discount to the lowest closing bid during the past 10 days. The investor's right to convert the note will be triggered upon the occurrence of one of the following: (i) 6 months from the date of said note, (ii) changed in control of the Company, (iii) the filing of a registration statement or offering, or (iv) election by the investor. The note was subject to the 251G reorganization and is not convertible into ENZC shares but is now debt recognized as convertible debt of the private entity ENZC Sub, Inc. ("Predecessor").

On September 14, 2017, the Company issued an $10,000 12% unsecured convertible note to an investor due September 14, 2018, for $10,000 in proceeds. Under the terms of the note agreement, the note may be either repaid,

77

**ECO-PETROLEUM SOLUTIONS, INC.**
**(A DEVELOPMENT STAGE COMPANY)**
**NOTES TO FINANCIAL STATEMENTS**
**SEPTEMBER 30, 2014, AND 2013**
**(Unaudited)**

On October 28, 2013, the Board of Directors of the Company appointed Mr. Ernest B. Remo as a Director of the Company.

In addition, on November 14, 2013, the Company entered into a Consulting Agreement with Mr. Remo for a term of one year commencing on November 1, 2013. The Consulting Agreement provides for monthly fees of $2,000, plus reimbursable expenses, and the issuance of 250,000 shares of common stock as additional compensation for services. For the nine-month period ended September 30, 2014, the Company accrued $18,000 in consulting fees for Mr. Remo. To date, the issuance of 250,000 shares of common stock has not been completed.

Mr. Remo resigned from the Board of Directors effective October 8, 2014.

**(10)    Commitments and Contingencies**

*Operating Leases*

On September 1, 2014, the Company entered into a month-to-month, sub-lease for office space located in Nesconset, New York. The office space is approximately 705 square feet. The monthly lease expense for the entire office space is $1,000, of which the Company is obligated to pay $400. For the three-month period ended September 30, 2014, the Company accrued $400 in rent expense.

From January 1, 2014, through August 31, 2014, the Company had a month-to-month sub-lease for approximately 200 square feet of office space located in Locust Valley, New York. For the three-month and nine-month periods ended September 30, 2014, rent expense amounted to $1,650, and $6,600, respectively.

During 2013, the Company leased, on a month-to-month basis, approximately 600 square feet of office space located in Commack, New York. The office space was shared with Advanta Management Consulting, Inc., a company owned by Mr. James W. Zimbler, an officer, Director, and stockholder of the Company. Rent expense for the year ended December 31, 2013, amounted to $2,225.

During 2013, the Company also leased, on a month-to-month basis, approximately 2,000 square feet of office space located in Smithtown, New York. Rent expense for the year ended December 31, 2013, amounted to $12,000.

*Mergenthaler Settlement and Extension Agreements*

Effective September 21, 2012, the Company entered into a Settlement Agreement with Mr. Peter Mergenthaler, individually and as the agent for Eastern Glow Investments, Ltd. and Kingsgate Development, Ltd., entities who were initial stockholders of the Company when it was known as Falcon Media Services, Ltd., James W. Zimbler, Challenger Brands Corp., and the Company. The purpose of the Settlement Agreement is resolve and compromise all outstanding amounts due and owing from the allegation that full consideration was not paid at the time of the completion of the Share Exchange Agreement #1 between the Company and EMC (September 16, 2008).

78

On that date, the Company entered into Share Exchange Agreement #1 with EMC and its stockholders pursuant to which the Company agreed to acquire 100 percent of outstanding shares of EMC in exchange for 2,701 shares

### ECO-PETROLEUM SOLUTIONS, INC.
### (A DEVELOPMENT STAGE COMPANY)
### NOTES TO FINANCIAL STATEMENTS
### SEPTEMBER 30, 2014, AND 2013
### (Unaudited)

of common stock (post reverse stock split) of the Company.  The unpaid consideration referred to in the Settlement Agreement was not an obligation of the Company at the time of completion of the exchange, and since the transaction was treated as a reverse merger for financial reporting purposes, with all expenses of the transaction being expensed as incurred, the consideration called for by the Settlement Agreement is considered to be an expense of the reverse merger by the Company for financial reporting purposes.

The unpaid consideration due to Mr. Mergenthaler amounts to a total of $283,500, and was addressed in three parts:  (i) a cash payment of $75,000; (ii) the issuance of 600,000 newly issued shares of common stock (post reverse stock split) with a value of $150,000 which shares shall remain in a pro rata *pari passu* relationship to the total number of shares of common stock held by Mr. James W. Zimbler, as of the date of the agreement or in the future, for a period of one year; and (iii) the payment of $58,500 in monthly installments of $3,250 over a period of 18 months commencing January 1, 2013.  The payment of the unpaid amount of consideration called for by the Settlement Agreement was contingent upon the closing and funding of the reverse merger transaction (the Share Exchange Agreement #3), subsequently changed to the Asset Purchase Agreement, between Challenger Brands Corp. and the Company which closed on October 29, 2013.

Effective August 14, 2013, the Settlement Agreement was amended by an Extension Agreement between Mr. Mergenthaler and the Company which contains the following terms and conditions:  (i) All dates in the Settlement Agreement pertaining to activities of the Company related to capital formation and equity funding transactions were extended to September 30, 2014; (ii) Mr. James W. Zimbler and Challenger Brands Corp. were removed as parties to the Settlement Agreement and released from all obligations and conditions of the Settlement Agreement; and, (iii) references in the Settlement Agreement to capital formation and equity funding transactions between the Company and Challenger Brands Corp. were replaced with the Company as the responsible party for the completion of pending and future capital formation and equity funding transactions.

In addition, the cash payment due to Mr. Mergenthaler was increased from $75,000 to $133,500, and the term in the Settlement Agreement dealing with monthly payments of $3,250 over a period of 18 months was deleted.

Lastly, the Extension Agreement provides that in the event that the Company does not complete and close its pending and future capital formation and equity capital funding transactions by September 30, 2014, then the Extension Agreement was to be null and void.

However, effective September 30, 2014, by agreement between the Company and Mr. Mergenthaler, all dates in the Settlement Agreement pertaining to activities of the Company related to capital formation and equity-funding transactions were extended to January 5, 2015.

During the year ended December 31, 2013, the Company paid $10,000 to Mr. Mergenthaler as partial satisfaction of the cash amount owed to him.  For the nine-month period ended September 30, 2014, the Company paid an additional $7,500 to Mr. Mergenthaler as partial satisfaction of the cash amount owed to him.  Subsequent to September 30, 2014, the Company paid an additional $2,700 to Mr. Mergenthaler as partial satisfaction of the cash amount owed to him.

79

# Enzolytics Inc. Files Supplemental Information Report on the Sale of Biogenysis, Inc. and Virogentics, Inc to Sagaliam Acquisition Corp.

**PUBLISHED**
JUL 11, 2023 10:05AM EDT

- o
- o
- o
- o

**COLLEGE STATION, TX / ACCESSWIRE / July 11, 2023 /** Enzolytics, Inc. (OTC PINK:ENZC) (https://enzolytics.com/).

Enzolytics, Inc. ("ENZC" or the "Company") filed a Supplemental Information report today to provide additional details regarding the recently entered non-binding letter of intent with Sagaliam Acquisition Corp. ("NASDAQ: SAGA") ("SAGA") (together the "Parties") to sale the Company's two operating subsidiaries Biogenysis, Inc. ("BGEN") and Virogentics, Inc. ("VIRO") in a transaction valued at $450 million.

Dr. Gaurav Chandra, CEO of Biogenysis stated, "At Biogenysis, our primary focus is on developing and producing monoclonal antibodies to treat numerous infectious viruses. We have realized meaningful progress in achieving significant results which will be reported as we progress. Through the SPAC agreement, we will be able to expand our programs and bring monoclonal antibodies therapies to market more rapidly. Our intellectual property portfolio includes diagnostics, therapeutics, and vaccines targeting numerous viruses that have been analyzed using our AI technology. We expect that this progress and technology will lead to diverse licensing and partnering opportunities. AI has played a critical role in advancing our research and development in drug discovery, and we remain committed to using AI to revolutionize healthcare. We continue to partner with major biotech entities to assist us in pushing the boundaries of personalized medicine as we remain dedicated to our mission of producing safe and effective treatments using monoclonal antibodies."

Diana Zhabilov, CEO of Virogentics added, "The Virogentics team is excited about the SAGA agreement which will support further development of the Company's technologies and bring them to a higher level of achievement. Virogentics' IPF Immunotherapy platform can be used in combination with existing therapies for treatments of different viral and chronic diseases and under the proposed SAGA agreement, this extension can be realized. The Company is moving ahead toward registration of its ITV-1 therapeutics

80

under the requirements of the European Medicines Agency (EMA). Also, the Company expects favorable results from the outcome of ITV-1 trials being conducted in Africa. The Company is also currently focusing on the development of several new nutraceutical products for liver and brain detox that VIRO has been exclusively licensed for distribution in north America. These therapeutics will soon be presented to the FDA for approval."

Barry Kostiner, CEO of SAGA commented, "We are working together with the Enzolytics team to structure our transaction to give the Enzolytics shareholders the benefits of our Nasdaq listing, while also protecting their interests, given the current volatility in financial markets. Additionally, we are committed to working together to facilitate continued liquidity and provide the capital needed to properly fund the Enzolytics technology that has already demonstrated tremendous promise."

Charles Cotropia, CEO of Enzolytics, Inc., stated, "This transaction with SAGA is a monumental step forward for our Company, providing BGEN and VIRO with the necessary funding to fully advance technologies in the medical field that are so desperately needed. Each of our subsidiaries has laid the groundwork for therapies that are at a point where the next advances place them at the forefront of the global biotech market. We look forward to the journey ahead and the progress we know will be achieved as a result of this agreement.

## Enzolytics, Inc. Overview

Enzolytics, Inc. is a drug development company committed to commercializing its proprietary proteins and monoclonal antibodies to treat debilitating infectious diseases. The Company is advancing multiple therapeutics targeting numerous infectious diseases. One patented and clinically tested compound, ITV-1 (Immune Therapeutic Vaccine-1), is a suspension of Inactivated Pepsin Fraction (IPF), covered by U.S. Patent Nos. 8,066,982 and 7,479,538. Studies have shown it to be effective in treating HIV/AIDS. ITV-1 has also been shown to modulate the immune system.

The Company has proprietary technology for producing fully human monoclonal antibodies (mAbs) against infectious diseases which is currently being employed to produce monoclonal antibody therapeutics for treating the CoronaVirus (SARS-CoV-2), HIV-1 and the Feline Leukemia virus. The Company has also identified conserved epitopes on and has plans to produce mAbs targeting many other viruses, including HIV-2, Influenza A and B, H1N1 influenza, Respiratory syncytial virus (RSV), Small-Pox, Ebola Virus, Tetanus, Diphtheria, HTLV-1/2, Rabies, Herpes zoster, Varicella zoster, Anthrax, Mason-Pfizer monkey virus (MPMV) and Visna virus (VISNA). The Company has also analyzed epitopes of animal viruses and plans to produce mAbs for treating these animal viruses.

Safe Harbor Statement: This news release contains forward-looking statements that involve risks and uncertainties associated with financial projections, budgets, milestone timelines, clinical development, regulatory approvals, and other risks described by Enzolytics, Inc. from time to time in its periodic reports filed with the SEC. ITV-1 is not

81

approved by the U.S. Food and Drug Administration or by any comparable regulatory agencies elsewhere in the world.

While Enzolytics, Inc. believes that the forward-looking statements and underlying assumptions contained therein are reasonable, any of the assumptions could be inaccurate, including, but not limited to, the ability of Enzolytics to establish the efficacy of its therapeutics in the treatment of any disease or health condition, the development of studies and strategies leading to commercialization of its therapeutics in the United States, the obtaining of funding required to carry out the development plan, the completion of studies and tests on time or at all, and the successful outcome of such studies or tests. Therefore, there can be no assurance that the forward-looking statements included in this release will prove to be accurate.

Such forward-looking statements are based on current expectations. They involve inherent risks and uncertainties, including factors that could delay, divert or change any of the statements made, and cause actual outcomes and results to differ materially from current expectations. No forward-looking statement can be guaranteed. These forward-looking statements are made as of the date of this press release. The Company expressly disclaims any intention or obligation to update the forward-looking statements or update the reasons why actual results could differ from those projected in the forward-looking statements.

**Company Contact:**

# Enzolytics, Inc.1101 Raintree CircleAllen, Texas 75013
# www.enzolytics.com

**SOURCE:** Enzolytics, Inc.

View source version on accesswire.com: https://www.accesswire.com/766891/Enzolytics-Inc-Files-Supplemental-Information-Report-on-the-Sale-of-Biogenysis-Inc-and-Virogentics-Inc-to-Sagaliam-Acquisition-Corp

## IN THIS STORY

ENZC

# AFFIDAVIT OF SERVICE

On August 7, 2023, I served by U.S. Priority Mail with Tracking **and/or email** the true copies of the within document(s):

**(1)  Summons with Notice**
**(2)  Plaintiffs' Complaint**
**(3) MOTION FOR Summary Judgment with Appendix**
**(4) SUPPORTING DOCUMENTS**

upon the following parties and/or individuals:

**James W. Zimbler,**
110 Smithtown Blvd, Ste 3
Nesconset, NY 11767
(631) 257-5454

**IMMUNOTECH LABORATORIES, INC.,**
2000 North Sentra Express Way
Plano, Texas 75074.

Extreme Mobile Coatings Corp, Ltd.,
110 Smithtown Blvd, Ste 3
Nesconset, NY 11767
(631) 257-5454

**CHASE BANK,**
1000 Rocky Run Pkwy
Wilmington, DE 19803

Extreme Mobile Coatings Worldwide Corp.,
110 Smithtown Blvd, Ste 3
Nesconset, NY 11767

**Harry Zhabilow**
2000 North Sentra Express Way
Plano, Texas 75074.

**Structural Enhancement Technologies Corporation,**
110 Smithtown Blvd, Ste 3
Nesconset, NY 11767

**Billy Ray Miller,**
1101 Raintree Circle, Suite 130,
Allen, Texas 75013

**Eco-Petroleum Solutions, Inc.,**
110 Smithtown Blvd, Ste 3
Nesconset, NY 11767
(631) 257-5454

**Charles Cotropia,**
1101 Raintree Circle, Suite 130,
Allen, Texas 75013

1

**ENZOLYTICS, Inc.**
1101 Raintree Circle, Suite 130,
Allen, Texas 75013

**Biogenysis, Inc.,**
1101 Raintree Circle, Suite 130,

Allen, Texas 75013

**Virogentics, Inc.,**
1101 Raintree Circle, Suite 130,
Allen, Texas 75013

Dated:   7th Day of August 2023

X _____

**Peter Mergenthaler,**
494 Boston Post Road,
Wayland, MA 01778
(917) 808-9250 – (914) 215-2304
Petemerg100@gmail.com,
Imditprose@aol.com,

2

# Peter Mergenthaler,

494 Boston Post Road,
Wayland, MA 01778
(917) 808-9250 – (914) 215-2304
Petemerg100@gmail.com,
Imditprose@aol.com

August 6, 2023

U.S. District Court for the
Southern District of New York
**OFFICE OF THE CLERK**
500 Pearl Street,
New York, NY 10007

      Re.    Submission of Plaintiffs' New Civil Action
              Mergenthaler *et al.* v. Zimbler, et al.

Ladies & Gentlemen:

    Kindly find enclosed for submission to the Court:

(1) **Plaintiffs'** Summons and Complaint with Affirmation of Service,
(2) **Plaintiffs'** Motion for Summary Judgment with (i) Affirmation in Support **and (ii)** Appendix, **with** Table of Content, **and (iii)** Affirmation of Service,
(3) **Plaintiffs'** Application to Proceed with Proceeding in this Court without prepaying fees, with supporting documents and proposed Order.

    Kindly call me at (917) 808-9250 or (914) 215-2304 in the event you need to provide me with some necessary instructions before docketing my proceeding, or request some more information or documents, or give me the Docket Number of the instant action.

    Thank you very much for your attention and cooperation.

                         Sincerely yours,

                         Peter Mergenthaler,

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Peter **MERGENTHALER**, Mac Truong**,**     ) <br> Plaintiffs,     ) <br> *- against -*     ) <br> James W. **ZIMBLER,** Extreme Mobile     ) <br> Coatings Corp, Ltd., Extreme Mobile Coatings     ) <br> Worldwide, Corp., Structural Enhancement     ) <br> Technologies Corporation, Eco-Petroleum     ) <br> Solutions, Inc., Chase Bank, Harry **Zhabilov**,     ) <br> **Billy Ray Miller,** Immunotech Laboratories, Inc.,     ) <br> Charles **Cotropia, ENZOLYTICS, Inc.,**     ) <br> Biogenysis, Inc., Virogentics, Inc.,     ) <br> Defendants,     ) <br>     ) | **ACTION CIVIL No.** |

# APPENDIX

Compiled by

### Peter Mergenthaler, Plaintiff *Pro Se*
494 Boston Post Road,
Wayland, MA 01778
(917) 808-9250 – (914) 215-2304
Petemerg100@gmail.com, lmditprose@aol.com

# APPENDIX
# Table of Contents

Pages

**SDNY – U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK –**
**Dkt No.**  Mergenthaler et al. **Notice of Summons** in a Civil Action   …………………….…....   1-4

**SDNY – U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK –**
**Dkt No.**  Mergenthaler et al. **Plaintiffs' Complaint**   ………………………………………....   5-14

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure**
**Guidelines For the Period Ending: December 31, 2020**  …………………………………….   15-30

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**(1) Names of the Issuer and its predecessors (if any)**  …………………………………….   16

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**Address of the Issuer's principal executive office**  …………………………………….   16

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**(2) Security Information** ………………………………………………………….   16-17

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**(3)  Issuance History** ……….………………………………………………….   18-21

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**(4) Financial Statement** ………………………………………………………….   22-26

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**(7) Company Insiders**  ………………………………………………………….   27-29

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**Principal Financial Officer – Harry Zhabilov** ………………………………………….   30

**ENZOLYTICS, INC. Disclosure Statement Pursuant to the Pink Basic Disclosure.**
**Supplemental Infor Relating to Share Issuance History** …………………………….   31-34

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
**Dkt No. 21-1163-RGA** Mergenthaler Affidavit re Fraudulent Transfer of his EPS Share ………...   35

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
**Dkt No. 21-1163-RGA** Letter by Plaintiff Mergenthaler to Tiffany Baxt**er re**
**the Reissuance of 10,000,000 Enzolytics shares** ……………………………….....................   36

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
**Dkt No. 21-1163-RGA** Evidence of Fake Stock Power Submitted by Defendants
to Chase Bank to defraud Plaintiff Mergenthaler …………………………………………….   37

I

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
Dkt No. 21-1163-RGA July 6 2015 Letter of Resignation by James W. Zimbler
from Eco-Petroleum Solutions, Inc. ..................................................................... 38

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
Dkt No. 21-1163-RGA Court Memorandum Opinion August 17 2022 ................................ 39-46

**USDC-DELAWARE – U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE –**
Dkt No. 21-1163-RGA Court DISMISSAL ORDER August 17 2022 ...................................... 47

**ENZOLYTICS, INC., AND SUBSIDIARIES BALANCE SHEET**
YEARS ENDED DECEMBER 31, 2021 AND 2020 - Assets & Liabilities ................................ 48

**ENZOLYTICS, INC., CONSOLIDATED  STATEMENT OF OPERATIONS**
YEARS ENDED DECEMBER 31, 2021 AND 2020 ............................................................ 49

**ENZOLYTICS, INC., STATEMENT OF CASH FLO** ...................................................................... 50

**ENZOLYTICS, INC.,  STATEMENT OF STOCKHOLDER'S EQUITY** ............................................ 51

**ENZOLYTICS, INC., and subsidiaries NOTES TO CONSOLIDATED FINANCIAL**
STATEMENTS YEARS ENDED DECEMBER 31, 2021 AND 2020: 1- Organization
and Business Description, Merger Agreement, Basis of Presentation, Research
and Development Costs ……………………………………………………………………............. 52-55

**ENZOLYTICS, INC., and subsidiaries NOTES TO CONSOLIDATED FINANCIAL**
STATEMENTS YEARS ENDED DECEMBER 31, 2021 AND 2020:  Note 4.
Notes payable to Investors   As of December 2021 .......................................... 56-67

**ENZOLYTICS, INC., and subsidiaries NOTES TO CONSOLIDATED FINANCIAL**
STATEMENTS YEARS ENDED DECEMBER 31, 2021 AND 2020 – Year Ended
2020 – Delaware Sept. 14 2022 Federal Litigation 21-Cv-01162-RGA by
Plaintiff Mergenthaler ..................................................................................... 68-69

**ENZOLYTICS, INC.,  NOTES TO CONSOLIDATED FINANCIAL STATEMENTS NINE**
MONTHS ENDED SEPTEMBER 30, 2021 ............................................................ 70-74

**ECO-PETROLEUM SOLUTIONS, INC - FINANCIAL STATEMENTS –**
SEPTEMBER 30 2014-2015  ................................................................................. 75

**ECO-PETROLEUM SOLUTIONS, INC - FINANCIAL STATEMENTS – Disclosure Statement**
Pursuant to the Pink Basic Disclosure Guidelines Enzolytics,  Inc. ANNUAL REPORT
for the Period Ending: December 31, 2022 ....................................................... 76-79

Enzolytics Inc. Files Supplemental Information Report on the Sale of Biogenysis, Inc.
and Virogentics, Inc to Sagaliam Acquisition Corp. Published 7/11/2023 .............. 80-82

**PRIORITY**® MAIL

PRIORITY MAIL
POSTAGE REQUIRED



UNITED STATES POSTAL SERVICE ®

**PRIORITY** MAIL

**UNITED STATES POSTAL SERVICE®**

**P** | **US POSTAGE PAID** | Retail
**$10.45** | Origin: 07306
08/07/23
3338730403-07

**PRIORITY MAIL®**

2 Lb 1.10 Oz

**RDC 01**

EXPECTED DELIVERY DAY:   08/08/23

C099

SHIP
TO:
500 PEARL ST
NEW YORK NY 10007-1316

**USPS TRACKING® #**

9505 5160 2831 3219 4454 52



RECEIVED
AUG 08 2023
CLERK'S OFFICE
S.D.N.Y.

FROM:

**Dmt MACTRUONG**
**875 Bergen Avenue**
Jersey City, NJ 07306



USMP3
SDNY



TO:

Prok
B.C



**U.S. District Court for the**
**Southern District of New York**
**OFFICE OF THE CLERK**
**500 Pearl Street,**
**New York, NY 10007**

RECEIVED
AUG - 9 2023
PRO SE OFFICE

PRESS FIRMLY TO SEAL

LY TO SEAL



**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

S.COM®
S ONLINE

DuPont™Tyvek®
Protect What's Inside.™

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14 © U.S. Postal Service; July 2022; All rights reserved.